IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| vs. ) | CRIMINAL CASE NO. |
| ) | 1:22-cr-0340-MJM |
| DONTE WILLIAMS, ) | |
| Defendant. ) | |
| ______________________ ) | |

MONDAY, JUNE 16, 2025
Courtroom 5C
Baltimore, Maryland

TRANSCRIPT OF PROCEEDINGS
MOTIONS HEARING - (ARGUMENT)
BEFORE THE HONORABLE MATTHEW J. MADDOX

For the Government:

Patricia McLane, Esquire
Stanton Lawyer, Esquire
US Attorney's Office
36 South Charles Street, 4th Floor
Baltimore, MD 21201

For the Defendant:

Christopher Nieto, Esquire
Nieto Law Office
1 North Charles Street, Suite 1301
Baltimore, MD 21201

Also Present:

Lisa Christy, ATF Special Agent

(Computer-aided Transcription of Stenotype Notes)

Reported by: Amanda L. Longmore, RPR, CRR, FCRR
Federal Official Court Reporter
101 W. Lombard Street, 4th Floor
Baltimore, Maryland 21201
410-962-4474

P R O C E E D I N G S

(2:29 p.m.)

(Testimonial Portion Filed in Separate Transcript)

THE COURT: All right. Then I'll hear oral argument on the motions. Let me see the order we should go in. I'm inclined to go with the dismissal motion first.

Whenever you're ready, Mr. Nieto.

MR. NIETO: Yes, Your Honor. Court's indulgence, if I may.

All right. So, Your Honor, as I had already indicated to the Court previously, on behalf of Mr. Williams, we had filed four separate pretrial motions starting at ECF 98, 99, 100, and 101. It sounds like Your Honor wishes to start with ECF 101, which was the speedy trial, Sixth Amendment.

THE COURT: Correct.

MR. NIETO: Okay. Yes, Your Honor. And so I had outlined all of this in my filings but I did just want to make sure I put on the record a few additional pieces of information for the Court's edification in ruling on this particular issue.

So as the Court presumably already knows, Mr. Williams was arrested on September 4th, 2022, on state charges regarding the possession of a firearm. In fact, we had seen the body-worn camera for that. He had posted bail and was released pending trial. He was then subsequently arrested on September 28th on unrelated state charges regarding the possession of another

firearm and drug possession, possession with intent to distribute. He was then held without bail.

Now, Mr. Williams was presumably already on the federal radar for a previous federal case that he had and, as I understand it from the docket sheet, the Government was in the process of obtaining an indictment for the September 4th conduct when he was arrested September 28th. They then sought to include the September 28th conduct in the same indictment as the September 4th conduct resulting in a superseding indictment.

So chronologically speaking, Your Honor, the Government obtained their first indictment for what happened on September 4th, they obtained that on September 29th. He was arrested the day before and then they filed for a superseding indictment containing both conduct, which was then filed on October 27th of 2022.

Mr. Williams then made his appearance a little less than a week later on November 2nd and has remained detained on these matters ever since. In total, he's been sitting for approximately 19 months on this case, 21 months including the time spent in state custody. Although, I think my math may be off on that, but I think Your Honor gets the point.

Mr. Williams, who had private counsel, who, by all accounts, did next to nothing in furtherance of the defense. Mr. Williams was initially housed at CDF here in Baltimore but

was moved by the Marshals to both Northern Neck Regional Jail in Warsaw, Virginia, that is about a three-hour one-way drive, and then he was removed to the Northeast Ohio Correctional Center in Youngstown, Ohio, which is about a five-hour drive one way from here. I can submit to the Court that Mr. Williams's previous counsel did not have any in-person jail visits with Mr. Williams throughout the pendency of his case during the time that he was housed at these facilities, nor did he schedule any legal visits or legal calls. In essence, from what Mr. Williams has reported, he was essentially sort of left out of state without contact from his attorney.

This came to a head in the latter stages of 2024 when even, I submit, the Government realized that nothing was happening with the case and next steps needed to happen. From the Court's own recollection, private counsel was habitually difficult to contact and often did not show up for court. Contemporaneous to Mr. Williams' matter, the same prior counsel was discharged from representing another federal client for the same type of inaction and inattention to those matters. In fact, Magistrate Judge Austin even had a Show Cause Hearing for that attorney to determine why not to forward these allegations to the Attorney Grievance Commission. None of this had anything to do, of course, by any actions by Mr. Williams.

I was eventually appointed after all those transgressions came to light and we demanded a speedy trial as quickly as we

could. Due to scheduling matters, the trial was not set until December, but within -- thankfully due to the Court's calendar opening up, we were able to move it up to August, which will result in Mr. Williams spending approximately 33 months in custody pretrial.

The length of time in bringing this case to trial I can submit to the Court was not due to ongoing plea negotiations but due to a relative general inactivity on the part of the attorney involved in Mr. Williams' case. We acknowledge, we acknowledge that at every day of the pendency of this case the Court tolled the speedy trial clock pursuant to primarily consent motions. But irrespective of the consensual nature, presumably Your Honor did the requisite ends of justice analysis independently on each one of the requests and, as I said, notwithstanding the alleged consensual nature.

So I'll be candid in the sense that we don't know if there's truly a violation of the Speedy Trial Act as formulated because I do not see a period of 70 days or more in which the clock was not tolled. But I would be remiss if I didn't tell the Court that prior counsel did not consult with Mr. Williams in agreeing to toll that speedy trial clock and, in essence, did very little, if nothing, during the two-plus years in which this case was pending.

For goodness sake, for goodness sake, the prior counsel didn't even file any pretrial motions in this case during this

time period or at all, for that matter, and Mr. Williams was simply sitting in a jail without release conditions while his lawyer and the other lawyers go home every night. The level of inattention and nonchalance is beyond the pale as there's no reason for the extended delay in bringing the case to trial.

Notwithstanding the Speedy Trial Act analysis, I would also submit to Your Honor that under the umbrella of the Sixth Amendment's right to a speedy trial guarantee, if the Court were to conduct the four-part Barker v. Wingo analysis, it would support the relief that Mr. Williams is seeking.

Number one, the delay in bringing this trial is uncommonly long despite the U.S. Attorney's involvement in this case starting from, at the latest, in September of 2022, resulting in almost a three-year period of pretrial incarceration. There was no reasonable basis or reason for the lengthy delay.

To be candid, Your Honor, many cases take time, they could use some room to breathe, it allows the parties to sort of work their way through, but the lackadaisical and molasses-like pace of this case is simply unacceptable. Without any consideration for Mr. Williams's constitutional rights, this case languished for years without anything happening. Seemingly no one was motivated by any time frame other than their own and there is no legitimate basis for that delay.

The third prong would be the assertion of the speedy trial right. I submit to the Court that we did as soon as I could.

Of course, Mr. Williams took no steps in delaying the matter and, as I indicated earlier, was not consulted and did not consent to the tolling of the speedy trial clock as his attorney was consenting to.

Lastly, Your Honor, there's the prejudice prong. Obviously there's no need for affirmative proof of prejudice. It's not essential to these claims, but I will submit to Your Honor that the period of time in which my client has spent incarcerated, not to mention the difficulty in putting together our witnesses to be able to assist us in this case, based on the antiquity of these charges, it is sort of in the balance why we submit that the analysis under Barker v. Wingo supports the dismissal of the indictment.

THE COURT: I just want to be clear about what you said in terms of your proffer from your client. Are you saying that he never spoke with Mr. -- well, prior counsel, retained counsel?

MR. NIETO: And, Your Honor, I will not say that there was never a time that he didn't communicate -- I'm not suggesting that there was never any communication from the initial appearance to the day in which I was appointed.

What I am suggesting to Your Honor is that the consent to toll the speedy trial clock that was given was not done in concert with an attorney-client conversation about the viability of the defense, of the speedy trial clock, or the

benefits of moving forward with trial in a faster and better, more efficient fashion. So I can tell Your Honor that I cannot provide the Court a 100 percent proffer as to the zero communication. I can tell Your Honor insofar as it matters in anticipation of today's hearing, trying to reach out to prior counsel proved fruitless.

THE COURT: Is it correct that at the same time that you opposed the speedy trial motion that you did oppose you still needed additional time to prepare motions and to prepare for trial, correct?

MR. NIETO: Well, Your Honor, time is required to prepare, to be sure. But if the Court had said that this case were to be tried within a 70-day time period, and of course the tolling, filing of motions would toll the speedy trial clock anyway, but if the Court said this case was to be tried within 70 days, we would have tried this case within 70 days. I do not believe that the discovery was so voluminous that it would require tantamount to years of preparation to be able to identify, research, and present arguments against the legality of law enforcement in this case.

THE COURT: All right. Thank you.

MR. NIETO: Thank you.

THE COURT: Ms. McLane?

MS. MCLANE: Certainly, Your Honor.

Your Honor, it appears that there's not really an argument

in terms of the statutory Speedy Trial Act in terms of the ends of justice finding. There is obviously an issue as to whether or not -- how defense counsel represented the consent was, but, again, the main thing for the Court to understand is, however former counsel conducted themselves with their client, there is a mechanism to deal with that beyond just this criminal trial, and that the remedy for whether or not that consent was discussed with Mr. Williams, whether it was strategic, whether it was, candidly, ineffective, that is for another proceeding. But certainly a dismissal based on just the representations from counsel without a factual -- any other factual record is just not appropriate.

And that leads me to the constitutional issues because I think that's really where the crux of the argument here is. There is actually beyond just the no factual record of whether or not the consent was with the knowledge of Mr. Williams or for strategic or any other issues, there's no factual record of prejudice. And I'm going to jump right to that one because that one is the most compelling. And here, we have a situation where defense counsel himself has said this wasn't a complex matter and he can't point to anything that was prejudicial that he can no longer access because of the 33 months. I'm not quite sure if that's accurate. I'm going to go with 33 months, that sounds correct.

THE COURT: I think he's talking about 33 months

between the time of indictment --

MS. MCLANE: Correct.

THE COURT: -- till the time that the trial is scheduled.

MS. MCLANE: Correct. And that does sound correct. Your Honor, there's been nothing in the filings, there's been nothing represented today that Mr. Williams is able to say, I can't call a witness and that witness is John Doe because John Doe has died in these 33 months. He can't say I don't know -- I can't present a video showing something else to conduct Officer Elleby because 33 months have passed. There's just this obviously prejudice that he has been incarcerated for 33 months, the Government would never say that isn't something that is insignificant, but what we're really looking at is what has happen -- what can't he do 33 months out, and there hasn't been any proffer or any evidence at all that there has been that type of prejudice.

Your Honor, in terms of the timing, obviously that does not go in the Government's favor. We are over a year. But I do want to quibble with the idea that defense counsel said nothing was happening. There was a lot happening on the Government's part. Once the Government realized that the case was not going to resolve, for whatever reason, the Government asked for a scheduling order. The Government asked for a motions hearing deadline. The Government agreed to extend it.

The Government prepared witnesses. The Government prepared and marked all of their exhibits. Your Honor received a notebook. Defense counsel receive that notebook. We filed motion in limines. We filed Rule 16. So we were preparing to go to trial. That time was being used. Whether former counsel was using it or not, we don't know because we never got to the trial since he was relieved of being counsel before we got to that position.

And so, Your Honor, that dovetails into the reasons for the delay. The Government was using that time in order to get ready for trial, and previous to that the Government was having, candidly, brief conversations with defense counsel, but a way to talk about how could it be resolved. And former counsel was concerned about additional charges, former counsel was concerned about the length of the time. And so there were these discussions going on, and at no point was there any indication, until there was, that this case was not going to resolve. So that end of justice in terms of could there be a plea, that was being fulfilled, and once that time passed and a scheduling order was put in place, the Government was using all of that time to get ready for trial. And Your Honor did see the efforts that we took at the pretrial conference end of January.

And finally we're talking about the timeliness of the speedy trial assertion. This is not Mr. Williams' first foray

into federal court. At no time prior to Mr. Nieto's appointment did Mr. Williams contact the Court and make any sort of complaint. I'm not suggesting it's his burden. I'm not trying to burden shift here, but there are mechanisms for defendants unhappy with counsel or just frustrated to make contact with the Court or the Government to put us on notice. There wasn't any of that. And I understand he was in Virginia, I understand he was in Ohio, but he has been -- he was at CDF both before and after and at no point were we aware that there was any sort of issue with his counsel. He certainly could have asserted his speedy trial independent. We've seen that all the time with defendants that are unhappy, and it wasn't until Mr. Nieto came in that -- did he assert that speedy trial right, and at that point the Government had already spent a lot of time getting ready for trial and had their exhibits and had their witnesses.

So, Your Honor, I just don't see how this rises to the level of a Sixth Amendment violation on the part of what the Government didn't do, which all the defense counsel has said is we moved as slow as molasses. I will tell you it did not feel like it was in molasses while I was marking all of those exhibits or trying to come up with some sort of way to resolve the case. But certainly, it really is more about the factors and I believe that three of the four of them, if they are not -- if they do not run in the Government's favor, they are

certainly neutral and therefore the defendant hasn't met his burden to show that a dismissal of the case is really required here.

THE COURT: Thank you. Anything else, Mr. Nieto?

MR. NIETO: No, Your Honor.

THE COURT: All right. So the Sixth Amendment provides that in all criminal prosecutions, the accused shall enjoy a right to a speedy public trial. That's the Sixth Amendment. "The bounds of this right are impossible to determine with precision," said the Fourth Circuit, quoting the Supreme Court. That's United States v. Pair, 84 F.4th 577 quoting Barker v. Wingo, 407 U.S. 514.

The Supreme Court has refused to quantify the right into a specified number of days or months or to hinge the right on a defendant's explicit request for a speedy trial. Despite its imprecise nature, the consequence for violating a criminal defendant's right to a speedy trial is severe in that it requires the dismissal before the truth of the Government's charges can be determined at a trial.

To determine whether a pretrial delay contravenes the right to a speedy trial, the Supreme Court developed a four-part balancing test in Barker v. Wingo requiring the Court to consider, number one, the length of the delay; two, the reasons therefore; three, the timeliness and vigor of the assertion of the speedy trial right; and fourth, prejudice to

the defendant. To prevail on a speedy trial claim, the defendant must establish that on balance the four separate factors weigh in that defendant's favor.

The first Barker factor calls for consideration of the length of delay between indictment and trial. The Court must determine whether the delay before trial was uncommonly long. In addition to serving as one of the four factors in the balancing test, this factor also serves as a threshold requirement necessary to show that the length of the delay triggers a speedy trial analysis.

Accordingly, the Court must first decide whether the length of the delay triggers that analysis. In the instant case, approximately two years and nine months have passed since the indictment was filed in this case, and it will be approximately 33 months by the time trial comes. This is an uncommonly long delay that's more than sufficient to trigger a speedy trial analysis.

Next, the Court must weigh the extent to which the delay stretches beyond the bare minimum needed to trigger the speedy trial analysis. The Supreme Court has observed that post-accusation delay is presumptively prejudicial at least as it approaches one year. And that's Burgess quoting the Doggett case. Doggett is 505 U.S. The pincite is 652, Footnote 1.

But even a post-accusation delay as short as eight months would qualify it as presumptively prejudicial in cases of

limited complexity. This case arises from two encounters between the defendant and law enforcement on two separate dates in September of 2022. There's nothing particularly complex about the case. There is no indication that discovery was voluminous. The length of the pretrial delay was quite substantial for a case of this limited complexity; therefore, the first Barker factor weighs in favor of the defendant in seeking dismissal on speedy trial grounds.

Turning to the second Barker factor, that requires the Court to consider the reason for the pretrial delay. The Court must determine whether the Government or the criminal defendant is more to blame for the delay. Barker instructs that different weights should be assigned to different reasons. The reasons for pretrial delay must be categorized as either valid, improper, or neutral, focusing on the intent of the prosecution.

In United States v. Loud Hawk, the Supreme Court recognized that the second Barker factor, the reason for the delay is the flag all litigants seek to capture, and several courts have taken that statement to place special importance and focus on the second Barker factor in the speedy trial analysis.

Here, the Government's reasons for the delay are mostly valid. The Government filed a series of motions for continuances that were granted and resulted in the exclusion of

a period of time between November 10th, 2022, and February 24th, 2025 from Speedy Trial Act computations. The time necessary initially for the Government to disclose -- time was initially necessary at the outset of this case for the Government to disclose discovery and then time was necessary for the defense to review it, and discovery was disclosed within approximately two months of the indictment.

The parties also required time -- or required time to discuss a resolution of the case short of trial, and the Government cited several topics of discussion between themselves and the defendant's former counsel that occurred during this period of time. And the defense consented to almost every continuance. There was one instance in which Government counsel was unable to reach defense counsel and then Judge Russell granted that motion without any objection from the defense.

In the summer of 2024, the Court scheduled trial to begin on February 24th of this year. On January 24th of this year, the Court conducted a hearing on pending motions and a pretrial conference and the defendant's retained counsel stated that a plea offer from the Government was still being considered and under consideration, although it was not accepted at that time.

As that trial date neared, in February of 2025, defense -- the defendant's retained counsel apparently stopped participating in the litigation and actively representing the

defendant. Retained counsel was then discharged and new counsel was promptly appointed to represent the defendant at the defendant's request. New counsel requested and required additional time to become familiar with the case and an opportunity to file pretrial motions, although the defendant's pretrial motions deadline had already passed. The time the defendant's new counsel needed was granted and a new pretrial motions hearing was set and that's the reason that we're here today. And the defendant in advance of this hearing did file several pretrial motions and trial is now scheduled to begin on August 11th of this year.

The reasons offered for the delay in this case, those contained in the Government's motions for exclusion of time, and then the defense's requests for additional preparation time are all valid. There is no evidence or indication that the Government purposefully delayed disposition of this case to hamper the defense; therefore, the second *Barker* factor weighs in favor of the Government.

The third *Barker* factor the Court must consider is the timeliness and vigor of the assertion of the speedy trial right, and that's *United States v. Pair* again that I'm quoting from. The defendant's assertion of this speedy trial right is entitled to strong evidentiary weight in determining whether the defendant is being deprived of that right.

In *Barker*, the Supreme Court rejected the rule that the

defendant who fails to demand a speedy trial forever waives that right. At the same time, however, the Court also emphasized that "failure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial," and I'm quoting from the Barker case at Page 532.

Here, the defendant did not assert his right to a speedy trial until February 25th of this year, when he filed a response to the Government's motion for exclusion of time.

In that response, the defendant states that he desired a speedy trial but even then stated additional time was needed to prepare pretrial motions, to conduct a motions hearing, and to prepare for trial. The defendant did not file a motion for dismissal until May 9th of this year, more than two months after opposing the Government's motion for exclusion of time.

Moreover, while the Court credits the defendant's present counsel's statement that the defendant has desire to speedy trial since an earlier point in time when the defendant was represented by retained counsel, I do note that on April 16th of 2024, retained counsel did state that he had communicated with the defendant and the defense had no objection to the Government's then-pending motion for exclusion of time from speedy trial computations.

In sum, the defendant's assertion of his speedy trial right came two years and four months after his initial appearance. The Court finds that this two-year delay to weigh

against a finding that the defendant's right was violated in this case. I'll cite United States versus Perry, 46 F.3d 1128, a Fourth Circuit case, although unpublished from 1995, where it states that with respect to the third factor, whether a defendant has timely asserted his right to a speedy trial may be weighed in favor of the Government when the defendant waits until late in the course of the events to assert his right.

There's also United States v. Brooks, a case out of this district, that's 734 F. Supp. 3.d 447, in support of the same proposition.

And the Fourth Circuit has found much shorter periods of delay in a defendant's assertion to a speedy trial right to weigh against a finding of a violation that happened in Pair, a case that I've already cited, where there was almost eight months after the indictment was filed that the defendant first asserted his right to a speedy trial and then after consenting to various continuances. There's also United States v. Robinson, 55 F.4th 390. There, there was a passage of time of more than a year after arrest before the assertion was made.

There's United States v. Grimmond, G-r-i-m-m-o-n-d, 137 F.3d 823. There, the defendant waited until four months before the start of his trial, more or less comparable to this case. There's also United States v. Ramey, 201 F.3d 438, where the defendant waited several months after learning of his indictment to assert his right to a speedy trial.

In each of these cases, this waiting period was determined to be untimely and the third Barker factor weighed against the defendant and so it must in this case as well. So the third Barker factor weighs in favor of the Government.

On the fourth factor, the Court must consider prejudice to the defendant caused by the pretrial delay, and the Supreme Court has identified three defense interests for consideration on this factor:

First, whether there was an oppressive pretrial incarceration; two, the anxiety and concern suffered by the defendant; and third, the possibility the defense was impaired. Of these interests, that third one is the most impactful and compelling, to use Ms. McLane's word, in this analysis.

Here, the defendant does not cite any such prejudice to his defense or his trial preparations that resulted from the delay. Instead, he cites stress, anxiety, and concern in a generalized manner lacking in specifics. He also cites his period of pretrial detention during his custody -- during which his custody was transferred between multiple institutions. The only apparent effect of these transfers had on the defendant was that it subjected him to different rules at different institutions and it also generally limited his ability to communicate with his family while incarcerated.

In sum, the Court finds nothing particularly oppressive about the defendant's period of pretrial detention. His

experience was more or less typical. I note that United States v. Pair is a case where both the Fourth Circuit and the District Court weighed the fourth Barker factor against the defendant even while acknowledging that his conditions of pretrial confinement which happened during the height of the COVID pandemic were particularly onerous and dangerous. But the Fourth Circuit held that general prison conditions could not establish a Sixth Amendment violation without a showing of actual prejudice.

I also recognize that this defendant, Mr. Williams's period of pretrial incarceration has been longer than those at issue in Pair and in Barker. I'm not sure about Barker but certainly it was longer than Pair.

Still, the Court finds that absent any showing that Mr. Williams's pretrial detention was particularly oppressive in a way that caused harm to him, the fourth Barker factor cannot weigh in his favor and the Court finds that this factor to weigh either -- to weigh either neutrally or in the Government's favor. At best, it would be neutral.

So none of the four Barker factors is necessarily sufficient or necessary to find a speedy trial violation. They must be balanced. Here, the first factor, the reason for the delay, weighs in favor of the defendant; the second factor weighs in favor of the Government, that's the reason for delay; and then the third factor also weighs against the defendant and

in favor of the Government given the untimeliness of the assertion. The fourth factor I find is either neutral or in favor of the Government, and in either case, on balance, the Barker factors weigh against finding a speedy trial violation in this case, so the Court finds no speedy trial violation with respect to the Sixth Amendment right.

As to the Speedy Trial Act, no violation has been identified here. I don't think I have to go very far with this, but I will say the Speedy Trial Act of 1974 does require the Government to proceed to trial within 70 days of indictment or the defendant's initial appearance, whichever occurs later. But there are certain periods of time that can be excluded from this computation. For example, § 3161(h) provides that a period of delay resulting from a continuance granted by the Court may toll the 70-day clock if the judge granted such continuance based on his findings that the ends of justice served by taking such action outweigh the best interest of the public and a defendant in a speedy trial. Such a period of delay is excludable only if the Court sets forth in the record of the case either orally or in writing its reasons for finding that the ends of justice served by granting the continuance outweigh the best interest of the public and the defendant in a speedy trial. This ends of justice balancing must be conducted contemporaneously with granting the continuance. And that's United States v. Hart, a Fourth Circuit case from last year.

The Court must put its findings on the record by the time it rules on a defendant's motion to dismiss. That's United States v. Pair.

So § 3161(h)(7)(B) provides a nonexhaustive list of factors the Court can consider in conducting this balancing, including whether the failure to grant such a continuance in the proceeding would likely make a continuation of the proceeding impossible or result in a miscarriage of justice, and there's also whether the failure to grant the continuance would deny the defendant reasonable time to obtain counsel, would reasonably deny the defendant or the Government continuity of counsel, or would deny counsel for the defendant or the attorney for the Government reasonable time necessary for effective preparation, taking into account the exercise of due diligence.

Here, the Court finds no Speedy Trial Act violation. At the times they were granted, the continuances were found by the Court to be necessary to accommodate the needs of the case. The Court conducted the ends of justice balancing required under § 3161(h)(7) each time it granted a speedy trial tolling motion. Upon each motion, the Court gave due consideration to the best interest of the defendant and the public in a speedy trial. Most of these motions were filed with the defense's consent. The one time a response opposition was filed, that opposition also stated the defense required more time to

prepare for motions and for trial.

So for all of the reasons I have explained, the Court finds that the Speedy Trial Act was not violated in this case and will deny the defense's motion to dismiss on that basis.

All right. I believe we can proceed to discuss the severance motion. Mr. Nieto?

MR. NIETO: Yes, Your Honor.

Your Honor, with regards to what would be ECF 100, which was our petition to sever the counts, Federal Rule of Criminal Procedure 8(a) permits the joinder of separate offenses when those offenses charged are of the same or similar character or based on the same act or transaction or are connected with or constitute parts of a common scheme or plan. The Fourth Circuit, from my reading, seems to have interpreted those latter two prongs to require that the offenses have a logical relationship to one another.

In this particular case, there are two separate instances, that being the September 4th and September 28th date that are not related to the same series of events or any commonality between the two. In one, we have a gun found in a rear passenger compartment of a vehicle; and the other case involves drug dealing and the possession of firearms on his person. One occurs, based on the exhibits, just a few blocks north of Patterson Park in the Northeast District of the city, and the other incident happens over on the southeast side, on the

opposite side of the city.

These are also separate dates. They are not part of a common scheme, and there is nothing indicated here to suggest a commonality. In fact, there is no nexus between the two incidents other than that they were both allegedly committed by Mr. Williams, which is part of the problem.

And forgive me, Your Honor, I had not cited the U.S. v. Hawkins case, so I don't like to cite to cases if I don't give it to the Court in advance. But, again, you know, what we're looking for here is whether the offenses are the same or of similar character. And so --

THE COURT: Do you have a citation for Hawkins? I may have missed it.

MR. NIETO: Yes, Your Honor. That is 589 F. -- I have "vd" but maybe it's third, forgive me -- 694. That's a Fourth Circuit case out of 2009.

In that matter, the Government contended that all three counts were properly joined as offenses of the same or similar conduct for two reasons. In that case, all three were firearm offenses and all events occurred within a three-week period. And the Government cites to these other cases but didn't actually provide that court with any true guidance.

And so what we talk about here in this particular case is that there's just no commonality. There's no allegation that Mr. Williams was selling drugs on September 4th and, again,

that's specifically why I was talking with that officer about the seizure of funds and their willingness to return them as not subject to asset forfeiture having been connected to some sort of malfeasance. And there was no allegations that the gun that was possessed in that vehicle was used in furtherance of drug distribution in any way, that he had used the weapon for drug distribution or the gun that he allegedly possessed was in any way connected to the conduct that we see happening 24 days later.

Near temporal relationships are insufficient to establish the propriety of joinder. And I would submit to the Court that there's nothing, there's no additional factors to indicate that these offenses are similar, identical, or share any commonalities within themselves. I do not understand or -- again, I was never a prosecutor, I don't understand the charging decisions, but in this particular case we have two separate offenses on two separate dates with very different sort of fact patterns. There's no overlap with police, there's no overlap with the witnesses. And, in fact, just the fact of, you know, assuming that the Court does not grant -- does not grant any of the defense motions at trial, I shudder to think how a reasonable juror, even as neutral as we would hope them to be, would be able to look at the footage from September 28th and believe, then, that there is reasonable doubt as to September 4th; or identically, if you were to flip it around,

they may find some aspects in one allegation to be more persuasive than the other, but because they are taken in concert together, a reasonable juror is not going to be able to delineate that the ways in which the Court or a trained legal professional may. And that is very troubling.

If Mr. Williams wanted to take the stand, for example, and talk about on September 4th some of the matters that were going on there, again, he would be opening himself up to cross-examination pertaining to September 28th, an incident about which he may not wish to have to testify. But again, once he's on the stand, he's opened up to cross-examination and there is no limitation with regard to that specifically because he is a criminal defendant in this case.

And so, Your Honor, the risk that is run, and I shudder to say it's a risk, I think it's a reality, that these cases are -- these two incidents are very different and very separate, but being tried together within the same allegation for the jurors to hear of two separate and distinct incidences, I do not believe under the circumstances in this case that they will be able to divide between that and give each count its appropriate consideration and attention. And that is of grave concern because of the constitutional rights afforded my client to have a fair and impartial jury and a fair verdict in these cases.

So for that, Your Honor, I would submit.

THE COURT: Would evidence of the gun possession on either date be admissible in the other trial if we separated the two trials?

MR. NIETO: Well, Your Honor, I suppose under --

THE COURT: Do I have to clarify that question? Maybe I asked it in a confusing way.

MR. NIETO: Like as a 404(b)?

THE COURT: Yes.

MR. NIETO: Well, Your Honor, again, there's an analysis for the Court to do on any 404(b) to take in concert with 403 and some other numbers for other portions of the code.

And I would submit to the Court that, again, based on the circumstances here, and I know Your Honor has -- I think there was a pretrial conference held in this matter either the beginning of this year or the end of last year in which the Court had made some rulings on motions in limine pertaining to Mr. Williams's prior convictions for handgun offenses and their admissibility.

I guess I hadn't actually asked the Court during our pretrial conference if we would have an opportunity to revisit those decisions, only because I wasn't there for it and I don't know what was presented by prior counsel.

But Your Honor's point is still well taken, which is I suppose my perspective here, Your Honor, would be there might be some aspects of the September 4th incident that might

give -- that might be relevant or might not be prejudicial in a prosecution on the 28th or vice versa, but the totality, the entirety of those encounters, the likes of which would happen during a trial in which they're determining guilt or innocence to each one of those counts, I would submit to the Court it would not be arguably admissible under 404(b) because of the complexities intertwined within them.

THE COURT: Can't these concerns generally be addressed through limiting instructions and there's lots of precedent to support that proposition?

MR. NIETO: Your Honor, yes, limiting instructions can be used; however, in this particular circumstance -- and again, I'm not talking about all matters, in this particular case with the charges and the specific factors and circumstances surrounding the two arrests, I caution the Court, I don't believe that curative instructions to the jury will be sufficient. Again, it's so closely intertwined and I don't -- and the way in which it would be presented I do not know how one can separate the two.

THE COURT: I'm not sure I completely understand what you mean by "closely intertwined." I mean, I would take it to support the proposition that the probative value is higher, that the two -- that each gun possession's probative value of the other one is high. You're saying they're closely intertwined and that seems to support that proposition.

MR. NIETO: And you're right, Your Honor. I suppose with regards to the September 4th incident, he's the driver of the vehicle, but there is a nexus argument to be made with regard to that. That nexus argument does not exist on the 28th. And again, if the jury concludes that September 28th actually happened and that my client was in possession of a firearm on the 28th, they're going to conclude that this gun in the vehicle 24 days prior he was knowingly in possession of. And that's the issue. And not falling under sort of the mimic umbrella. It's just a connection between, well, if he did this, he must have done that.

THE COURT: Well, I think it's more so if he did this, then he knew that he was doing that. In other words, if he was found in possession of a gun on the 28th, I believe is the date, that supports the notion that he knew that he was in possession of the gun earlier that month.

MR. NIETO: The possession of a firearm on the 28th indicating that he was knowingly in possession on the 4th?

THE COURT: Yes.

MR. NIETO: Respectfully, Your Honor, I suppose, from our perspective, we're looking at it a little bit differently.

THE COURT: Okay.

MR. NIETO: But I understand the Court's position. But again, in this particular case, in the context of the factors here, we think that joinder is impermissible, and so it

should be bifurcated into two separate trials, the counts relevant for the September 4th incident and then the counts relevant for the September 28th.

THE COURT: Okay. And just to switch it around a little bit, the earlier date is the date that he's found with the car?

MR. NIETO: Correct, Your Honor.

THE COURT: And that evidence would support the notion that he had association with the car later on in the 28th when drugs are found in it, would it not?

MR. NIETO: I suppose, Your Honor. Again, the fact that he had the keys on his person might be indicative of that as well without necessarily bringing in the September 4th incident, so I think there's ways in which those inferences can be drawn without running the risk, the reality of keeping matters joined and the influence that could have.

THE COURT: All right. Thank you, Mr. Nieto.

Mr. Lawyer?

MR. LAWYER: Thank you, Your Honor. I think you've actually covered and in your questioning raised many of the issues that I was going to raise, but I'll start with Rule 8(a) allows permissive joinder of separate offenses when they are the same or similar character.

Here, Counts 1 and 3 are the same charges and the only difference between them is that the Government must prove that

the defendant possessed different firearms on separate occasions. That testimony -- the testimony in support of that will allow a common expert regarding whether the handguns are firearms and whether the cartridge inside them are statutorily ammunition. The same expert will then also testify how the firearms and ammunition traveled in interstate commerce. So the term "nexus" has just been used and, in fact, that's a nexus expert. There will be a common one between both Counts 1 and 3.

The counts are also logically interrelated. As Your Honor just raised, if the defense theory is on September 4th Mr. Williams did not know that he possessed a firearm in his Infiniti, the fact that he possessed a firearm 24 days later is probative and should be available evidence to rebut that argument.

Similarly, if Mr. Williams argues that he didn't know about the narcotics found in his vehicle on September 28th, evidence that he was in control of that vehicle and the sole passenger in it 24 days earlier is also probative and should be available to rebut that argument.

Defense counsel raises the question of spillover. I'm not going to go into it particularly deep because I think the Fourth Circuit is very -- the Fourth Circuit's precedent on this issue is quite strong and quite clear that jury instructions can be curative on this issue.

And then lastly, as to his statements regarding his desire to testify, I think this is an issue that the Government raised in its response, is that vague assertions are just insufficient at this point. He has a standard of what he needs to offer, what he needs to say. He must provide information regarding the nature of that testimony and his reasons for not testifying. Saying that he may or may not testify, he may want to or may not, that's not sufficient at this stage. So if he hasn't met his burden, then, you know, granting severance based on that issue is just inappropriate.

If Your Honor has no questions, I'll rest.

THE COURT: All right. Anything further, Mr. Nieto?

MR. NIETO: No, Your Honor.

THE COURT: All right. I'm not going to rule on that one yet. Let's move on to the last two motions, the suppression motions. I guess we can take them separately.

Mr. Nieto, if you want to begin with September 4th.

MR. NIETO: Yes, Your Honor. And I know Your Honor knows all this stuff, but if I may, I'll just speak a little bit on some of the law here.

So as I've explained to Mr. Williams, the September 4th, 2022 encounter with the police was based on a traffic stop for tint, impermissible tint on the front windshield. That then resulted in the plain view of a magazine underneath a seat which resulted in the search, a warrantless search of the

vehicle recovering said magazine and then a firearm.

I submit to the Court that obviously, as Your Honor knows, temporary detention of individuals during a stop of an automobile by police constitute a seize no matter how brief that stop may be or how limited in purpose it may be. In determining the propriety of the traffic stop, the Court must look at two factors, which is whether the Court's -- sorry, the police officers' actions were justified at its inception, was there a basis to pull the car over, and then whether the officers' subsequent actions were reasonable related in the scope of the circumstances that justified the initial stop.

If the police observe a traffic violation and they prove -- they provide sufficient justification for them to detain the vehicle as long as it takes to perform the traditional incidence of a routine traffic stop. Absent reasonable suspicion of further criminal activity, the scope of the stop is limited.

Importantly, the Government must demonstrate that there was sufficient probable cause to conduct a traffic stop of this vehicle. As I suggested in my cross, initially the officer had written it up as if there was two bases for it; one was the temporary tag, or lack thereof, in the front of the vehicle, and the other one was the tint. And the officer made it clear there was no probable cause traffic violation for the lack of a front tag once they came behind the car and identified that it

had temporary tags and therefore would not be afforded a secondary tag for the front. However, the police also allege tinted windows and they would need a sufficient opportunity to make that observation prior to initiating the traffic stop.

As I suggested, based on the officer's testimony, these two cars were coming at each other driving in different directions. When the officer witnessed the vehicle, he said that he could not see inside. Our position is that his eyes would be naturally drawn to the space, the hole, the gap in his visual acuity, which would be where the license plate ordinarily would be. It's the type of salience that jumps out and you would notice when looking at the front of the vehicle and when one's eyes are drawn to that location, they are not drawn to the others. However --

THE COURT: I just want to make sure I understand your argument. You're trying to say that the evidence presented supports an inference that the officers didn't see the tint on the windshield?

MR. NIETO: All I'm suggesting to Your Honor, that when an officer is driving and passing another vehicle coming in the other direction, right, and if they're looking, their eyes are trained to look for whatever traffic violations they can find in a matter of seconds as the car is passing through. In a vehicle that does not have a front license plate, there is a space, oftentimes a black space on the front of the vehicle.

That is salient, that will jump out at you as just basic instinctive probable cause to pull the car over.

My only suggestion is that when an officer realizes that there's no front tag, their eyes are drawn to that portion of the vehicle. And if a car is in motion in passing, it's arguable but it is possible that their attention is so focused on the lack of a license plate that by the time their eyes and their gaze moves up, the car is already past them. And now we're dealing with sort of a revisionist post hac explanation for why we get there. But I will submit on the officer's testimony.

So again, assuming just for the limited purpose here that the officers were lawfully pulling this car over, then we argue to the Court that the officers, specifically this officer lacked probable cause for the plain view search because the incriminating nature of a magazine under a passenger front seat was not immediately apparent.

The Fourth Amendment's protection against unreasonable searches is not implicated when the plain view doctrine applies. The Court has held that viewing an article that's in plain view doesn't involve invasion of privacy and doesn't constitute a search implicating the Fourth Amendment. We understand that.

As I suppose as unusual as it may seem to me but perhaps not that unusual to members of Baltimore City, the fact that

there are these four officers surrounding the car, flashing lights in to constantly search while Mr. Williams is seated waiting for the license to come back is a little bit distinct and different from perhaps what I am accustomed to having in the, God forbid, moments in which I'm pulled over for a traffic infringement.

I'm suggesting to the Court that perhaps to a hammer everything can look like a nail, and that is not the analysis that this Court should have when determining whether this was appropriate. For the plain view exception to apply, the Government must show that he was lawfully in a place to observe the object, with the lawful right to access it, and that the incriminating character was immediately apparent, which is why I had said that to the Court before.

Interestingly, or maybe not, there isn't a whole lot of case law on this, and I think primarily because when a magazine is in a gun, the end of the magazine is right up against the bottom of the handle.

In this particular case, as Your Honor can see from the exhibit photos, we're dealing with an extended magazine, which means it is wholly probable and possible and probable, as I said, likely, as the officer testified, that all he saw was a magazine. A magazine in and of itself is not illegal to possess in your vehicle.

Part of my review in anticipation of this hearing was

trying to find something akin to it. The best I could do, Your Honor, was find cases involving pipes, crack pipes, marijuana pipes, things of that sort. And so oftentimes in those cases, there is another factor, another indicia of criminality. They see a plate, maybe they also see like an empty baggie, or if they see, you know, packaging materials, it's also there with distribution scales and cutting agent, things of that sort. Or there's like a strong smell of marijuana or they find something else to couple with this other innocuous image, this plain view that they have to then give rise to what we're talking about here.

And I think that's important because, again this is -- you know, even in the Government's filing when they talk about the magazine, they stop saying "magazine" and just called it a "Glock," and that's the issue, which it's not because the possession of ammunition or possession by a magazine, that isn't illegal. The fact that there's a magazine in a car does not suggest illegality simply by the nature of the item.

If the officer could have seen the gun, then this would be a very different analysis, but most importantly, he did not. Now, that's what he said, but he also reflected it contemporaneously in the video. Because when the other officer shows him, that looks like something, he checks, does not pull out his gun immediately, does not yell "gun," which is what police officers do when they see a firearm.

Instead, he asks the question, "Do you have a gun?" Respectfully, didn't really afford Mr. Williams too much of an opportunity to respond, but then for officer safety and the like, after he's removed from the car and then he goes right to the backseat to search.

But before he does, he tells the officer, make sure you check his waistband or dip area, further reflecting that the officer did not know that there was a gun in the car. Thought he might have a gun on his person. The relevance of that is because he only saw the magazine on its own.

And importantly, Your Honor, you know, this is sort of the risk that we have here, right, is the officer testified that he could identify the magazine as a magazine from his experiences, but he also said because you could see the word "Glock" emblazoned on the magazine.

Your Honor can look at the photo that the Government submitted with regard to that particular weapon, which is Exhibit 2.2. There is no marking of "Glock" on that magazine. There is a marking of "Glock" on the Glock, which is what I'm concerned about, which is after the event, afterwards, where having sort of this compounding of what he learned afterwards versus what he saw in the moment. Your Honor can look at the picture. There is no "Glock" emblazoned on that magazine.

So -- but be that as it may, even if it did have a "Glock" on it as we talked about, that is not a crime to possess. So

without an additional indicia of criminality, the officers have to do more before they're allowed to just go in the car and start searching. This is a normal traffic stop. It's broad daylight. There's no advanced information or concerns about Mr. Williams or that vehicle, about what the car is doing. It's a tint and/or tag violation. It's a traffic stop. It's a citation that's payable. That is the extent of it.

The police needed to do additional investigation prior to opening that car door and searching the backseat area, ask some questions, ask permission to search, run his record, find out if he's disqualified from possessing that, pat him down, look at it from different angles, talk amongst themselves, I think that's a magazine, let's see if we can see it from another place with our flashlight, give us a little bit more before we just started warrantly entering into this vehicle and searching things around.

In determining the incriminating character of a seized item, I submit that it has to be readily apparent and the police would need to have probable cause to believe that the item was evidence of a crime at the time. That is insufficient in the unique set of circumstances that we have in this particular case.

If Your Honor agreed with that analysis, then since the stop and seizure of Mr. Williams was not supported by the necessary basis, the fruit of the poisonous tree or the

poisoned police interaction should be suppressed and precluded from coming in as evidence. That would be specifically the recover of the $4,710 from Mr. Williams's person. There may be a motion in limine about that at the appropriate time, but in terms of its admissibility, we would submit that it is the fruit of the poisonous tree stemming from that illegal search of the vehicle without a warrant or exclusion -- circumstances to support it.

THE COURT: All right.

MR. NIETO: Thank you, Your Honor.

THE COURT: Thank you. Mr. Lawyer?

MR. LAWYER: Thank you, Your Honor. I think the defense theory regarding the initial traffic stop is a bit confused in that if an officer can view the front area of the vehicle and, quite simply, everyone saw the photo, the windshield was quite dark and the officer actually testified that he could not see the occupants.

And so if the officer saw that in that instance, he could rightfully conclude that that vehicle had an impermissible front window tint without regard to the front license plate, and even if the front license plate was not a sufficient basis for probable cause for the traffic stop, there is the basis on the front windshield. The officer testified that he saw it, and I don't think the defense has offered anything to suggest that that testimony has in any way been undermined.

So there is probable cause for the traffic stop on a violation of the Maryland law regarding front windshield tint, can't be fully tinted, can only have stuff -- window tint up to the AS1 line.

As to the officers' actions during the traffic stop and, in fact, I don't think defense counsel appreciates that he did exactly what he's asked for. He did exactly what defense counsel said hasn't been done. There was an investigation. One officer was looking through the window, saw something that in fact he thought was at least worthwhile to alert his colleague. No, he didn't shout out "gun" and yank him out the car. He did the exact sort of investigation and corroboration that the defense is asking for.

He told Officer Banocy, Officer Banocy pulls out his flashlight, looks. He believes that he sees the bottom end of a Glock magazine. When he confirms that himself, he corroborates what his colleague has told him, he then reacts. He asks the defendant, do you have a firearm in the car, basically orders him out, goes into the vehicle, and goes immediately forward and recovers the firearm -- recovers the Glock magazine.

Defense counsel I think wants to pull it all apart here and say, it's just the Glock magazine in the vehicle, completely innocuous, that's not illegal. But that's not what we have. We have a probable cause traffic stop with a

window -- with a vehicle that is completely blacked out and tinted all the way around, you've got an officer saying I believe there's a firearm or a -- excuse me, a magazine in the back of this vehicle. Another officer corroborates that, and based on his training and experience believes that that magazine is likely loaded into a handgun. He knows handgun in vehicle is impermissible under Maryland law.

So all that defense counsel is asking for to support this traffic stop and to support the search of this vehicle is present. He just doesn't want to see it.

So the minute the officer concludes there is a magazine, and I believe that -- and he believed that that magazine was loaded into a firearm in violation of Maryland law, and then once he goes into the vehicle, searches the vehicle, and pulls Mr. Williams out, while -- excuse me, not pulls Mr. Williams out. Locates him, recovers that handgun and confirms, yes, it's a handgun and, yes, it's in fact loaded, Mr. Williams is under arrest, and then search incident to arrest allows the recovery of the U.S. currency on him.

Unless the Court has any further questions, I'll rest.

THE COURT: All right. Anything further, Mr. Nieto?

MR. NIETO: Just briefly, Your Honor.

Again, the probable cause to pull the vehicle over doesn't really weigh in on the analysis on whether the search of the vehicle is appropriate. I understand Government counsel's

point, but I'm looking contemporaneous to the moment what it is that the officer says. I'm not talking about what he's saying now, some 31 months later. I'm talking about what he said in the moment.

And so respectfully, his conduct in the statements and what he says on that video indicates that all he sees is a magazine and he did not believe that that magazine was connected to a firearm at the time. That is supported by his question to Mr. Williams, the statement he made to the police officer who pulls him out of the car, and even when he slowly moves that chair back up, he declares not that he sees a firearm, but there it is in plain view the magazine, which means that even when he's opening the door and stand -- or sitting and looking right at it within a few feet, he does not see the firearm.

So at the time this traffic stop is happening, the plain view of a magazine doesn't say it's connected to a gun, doesn't say it has any bullets, that is insufficient to search. The police must do additional work to be able to figure out is there something really going on here because there's nothing inherently illegal with possessing a magazine in a vehicle. That is the -- that's the fulcrum, respectfully, from our position.

THE COURT: Is there anything further, Mr. Lawyer?

MR. LAWYER: Yes, Your Honor. The Government did not

offer Exhibit 2, and defense referenced Exhibit 2, but the magazine that was recovered was an extended magazine. And so, yes, it would naturally protrude below the bottom of the base of the firearm that was included that was recovered.

So the idea that the detective would declare, yes, there is the magazine, he's confirming I found the thing that I saw. Two things can be true at one time. There could be a magazine loaded into a handgun under the passenger's seat of the Infiniti and the defendant could also have a firearm in his dip. It would make sense for the detective to warn his colleagues who are pulling that individual out of the vehicle, please check his dip, he may have a firearm on him because I have recovered the magazine here, which I also believe could be loaded into a handgun.

THE COURT: Did he testify about whether there was any response to when he told the other officer to check the dip?

MR. LAWYER: He did not testify on that but I don't believe we heard any response to that, at least on his BWC.

THE COURT: All right. We're -- just want to check.

MR. NIETO: And I'm sorry, Your Honor, I just want to apologize. I thought 2.2 was in. I didn't mean to reference an exhibit that was not into evidence.

And I was just checking with Ms. McLane with regards to the still photos, and the Government was kind enough to provide

me with all their anticipated exhibits, I wasn't keeping enough timekeeping to determine what had come in and what hadn't come in. If the Court has the exhibits of 11 -- specifically 11.3 and 11.4, I don't know if those were introduced or not. But, again, our position remains with regards to the emblazoning of "Glock" on the magazine.

THE COURT: All right. We just passed 3:30. We've been going on for I guess about two and a half hours at this point. We'll take a recess. Let's return at 3:55.

(A recess was taken from 3:34 p.m. to 3:58 p.m.)

THE COURT: Mr. Nieto, do you want to be heard on the remaining motion?

MR. NIETO: Yes, Your Honor. Thank you, Your Honor.

Pertaining to ECF 99, which is a motion to suppress related to the search on September 28th of 2022, again, I know Your Honor knows this, but the default Fourth Amendment position is that no search or seizure should occur until a warrant has been issued obviously based on probable cause.

The Supreme Court has carved out, however, a large and important exception to that, which is what we would commonly call a Terry stop. Officers can obviously conduct brief investigative stops if supported by reasonable articulable suspicion that they also have to demonstrate, as we said, by the crystal clear body-worn camera footage that he could not and did not see the contraband in his pocket on September 28th.

That is our position. There was no probable cause for the arrest and anything recovered after the officer grabbed Mr. Williams should be suppressed as fruit of that poisonous tree.

As I outlined in the arguments pertaining to the September 4 traffic stop, plain view doctrine does not apply if the incriminating nature is not immediately apparent.

Now, we would submit, Your Honor, that from this officer's perspective, it was not. In fact, this is precisely the type of case in which I'm relieved that we have body-worn cameras because, historically speaking, we would be left only with the testimony of the witnesses and not something a bit more accurate and aligned sort of in timeline with when the events occurred. But thankfully in this case we do. The video footage is clear as to what was visible by the police officer and most importantly what was not visible.

The body-worn camera does indicate that Mr. Williams' pocket was slightly open; however, at every single second and every frame of that video the police officer is not able to clearly determine the contents of this pocket. It is most likely, which is what I was suggesting to the officer, is that he had seen the bulge in the pocket, that he had seen the folded-up wad of U.S. currency. But he could not tell exactly what it was, it was unclear, and it was inarticulable. He acted on a hunch. The hunch ended up being correct, but it was

still a hunch nonetheless, and that would be insufficient for the search and seizure of Mr. Williams.

I understand what his testimony was, Your Honor, but we did -- or we could, and I encourage the Court, if Your Honor wishes to review the video footage, I've reviewed the video footage at least a dozen times frame by frame specifically geared towards this issue, because when I first watched it, there's no blue or white bright pills, which the Government I believe was kind enough to introduce an exhibit of the photos of the drugs that were recovered. If not, I apologize, Your Honor.

But again, the nature of the items should be readily apparent from the officer's perspective. And that's why we have the Defense Exhibit 1, which was just a still shot that provided the best angle of the interior of that pocket from the police officer's perspective.

I then created what is essentially a flip book that would provide the Court the ability to see Mr. Williams as he turns, and in every single step of the way, that pocket is dark, it is cloudy, and you cannot see anything within it. You can see it open, you can see a bulge, and I provided additional photos to help clarify that for the Court, most importantly in Defense Exhibit 5 where you can see the wad of cash.

It is our position, Your Honor, that obviously the possession of U.S. currency is not indicative of a crime and it

does not give reasonable articulable suspicion to escalate this interaction with police from a simple interaction to a stop and accosting.

And it's our position, Your Honor, that the body-worn camera controls, and absent something else that the officer might be able to provide, I don't understand the incongruity between what we could see in the video and the testimony.

It's also our position, Your Honor, that should the stop and seizure of Mr. Williams did not support by the requisite basis as we submit, then obviously the fruit of the poisonous police interaction should be suppressed and precluded from coming into trial. That would include the seizure of the keys, the search of the car, and any statements that Mr. Williams may have made at the time of his arrest.

THE COURT: All right. Just to be clear, you're not challenging the search of the car other than fruit of the poisonous --

MR. NIETO: Fruit of the poisonous tree.

THE COURT: I think there was another question. Let me see in the next five seconds if I can remember what it was. Give me one second.

Oh. Did you submit copies of your exhibits?

MR. NIETO: So Your Honor, I've had them labeled. If it pleases the Court, I'll pass it forward.

THE COURT: That'd be great.

MR. NIETO: Yes, Your Honor.

THE COURT: Mr. Lawyer or Ms. McLane?

MR. LAWYER: Thank you, Your Honor.

I'll start with trying to paraphrase with what Detective Elleby said that the BWC doesn't capture everything. It only captures what it captures. The BWC worn in the middle of your chest does not capture what your eyes see, given how tall you are, six, eight, ten inches, the difference. And so, in fact, there could be a material difference between what is captured on the BWC and what Detective Elleby says he saw.

He's offered -- at least the defense has offered no reason to doubt that testimony. In fact, the BWC seems to confirm it is that in the split seconds between the defendant getting up and walking towards the home and Detective Elleby getting up and walking to go find his colleagues, Detective Elleby seemingly noticed CDS in the defendant's pocket, decided to react to that, and seize the defendant and place him under arrest for possession of suspected narcotics.

I've spoken longer than that interaction actually took. That was seconds. That wasn't minutes. And, yes, a frame by frame analysis may not show that CDS and that pocket, but the frame by frame analysis is not what Detective Elleby was seeing. He testified that he saw the blue and white CDS in the defendant's pocket, and there's no reason to believe that that testimony is not credible.

Because defendant is no longer challenging, it seems, the K9 search, I think this really boils down to do we believe Detective Elleby's testimony. He testified credibly, he testified to what he saw, the BWC seemingly supports that, he's immediately in the defendant's pocket and said I believe you have CDS in here, he retrieves CDS. I'll rest on that.

THE COURT: Thank you. Anything further, Mr. Nieto?

MR. NIETO: Again, Your Honor, briefly.

The contradicting evidence that the defense has sought to present to the Court is, in fact, the body-worn camera. The nature of the pills, which Your Honor could see, the brightness, the white and blue, the size of them, and Government counsel is correct, this happened in a matter of two seconds. It was fleeting. That officer did not have the time or the ability to take a frame-by-frame viewing of everything to make sure that he saw what he thought he saw.

And so we look at the body-worn camera to provide the Court an unadulterated, unbiased vantage point of what was seen and could not be seen at that time. The officer acted on a hunch, and Your Honor can tell based on the video when the officer springs into action, based on the chronology of events, it was already after Mr. Williams had turned his back and was already almost on the steps, which indicates that the viewing of this open pocket occurred when he was closing the gate to that yard and turning around.

I had endeavored to provide the Court with still shots, again, to provide the Court the image of nothing in that pocket from the vantage point of this officer. Importantly, importantly, as I did provide one in which Your Honor can see the wad of cash and then the drugs which are almost hidden behind it, in fact, in that photo, in that photo it looks abundantly clear that the thing that could have been seen from the open pocket based on its placement in there is decidedly the U.S. currency.

I provide that to the Court, again, because the video is inconsistent with the officer's testimony. And I credit what Government counsel says, these things happen in the middle of seconds and we act instinctively, but it has to be articulable suspicion. It cannot be a just out of a flashing moment that there's a bulge and they think it could be something like drugs when it's obvious from the videos what can be seen and not seen. And so, Your Honor, on that I'll submit.

THE COURT: Is it correct, I mean, you made a point of pointing out that maybe he was mistaken about what he saw with respect to maybe he confused the money for the drugs, at least that's what I took your argument to be suggesting.

MR. NIETO: Yes, Your Honor. And in support of that, I included that as a Defense Exhibit 5, which is a photo of what Your Honor can see inside the pocket in which very clearly there's folded up U.S. currency, and then adjacent to it, sort

of closer towards the stomach area of the pocket you can see the outline of a bag and with what looks like some sort of muted blue colors in the back.

That is once they already have him cuffed and are pulling open his pocket on the camera. Even from that angle it takes a little bit to be able to see it but, again, that positioning of items in the pocket provides us some guidance as to what the position of those items may have been just a few seconds before, before the officer comes and apprehends Mr. Williams.

THE COURT: All right. Thank you.

The motions will be taken under advisement and I anticipate issuing a written ruling on them.

Is there anything else we should take up before we conclude today?

MS. MCLANE: No. Thank you, Your Honor.

MR. NIETO: No, Your Honor. Thank you.

THE COURT: And we do have a scheduling order in place with respect to motions *in limine*. I think that deadline is coming up soon. And also, I just want to make sure we have a pretrial conference date.

MS. MCLANE: Oh, actually, yes, I apologize, we do.

Would it be able -- maybe not today but if I could put it on the record. So I've been accepted to a training facility -- a training for faculty at the NAC, and it's July 29th, which is the day of our -- I'm sorry --

THE COURT: It's the day after.

MS. MCLANE: The day after. I have a conflict and so if I could just put that on the record, I was going to e-mail chambers to see if we could either do the pretrial earlier in the day before I flew out or --

THE COURT: After you get back.

MS. MCLANE: -- change the date.

MR. NIETO: If that works for the Court, no issues.

MS. MCLANE: So I'll just e-mail, if that's all right, and of course I forgot my calendar.

THE COURT: All right.

MS. MCLANE: And then also, Your Honor, the Government did submit motions in limine. You did grant them in the previous pretrial, understanding that Mr. Nieto wants another go at them, and I won't take a position on that.

Could we at least say that from the Government's perspective they're going to carry over?

THE COURT: The ones that you filed before?

MS. MCLANE: Correct.

THE COURT: Yes.

MS. MCLANE: And if Mr. Nieto wants to file an opposition, we'll certainly file a response, but I don't want to refile them if Your Honor would --

MR. NIETO: And I was going to base on the motions in limine the Government had already filed.

MS. MCLANE: Okay.

MR. NIETO: I think it was a few, it was maybe one to which I -- you know the 404(b) I just wanted to be heard --

THE COURT: Yes.

MR. NIETO: -- understanding Your Honor's ruling previously.

THE COURT: Right, no, you'll get an opportunity to be heard on those motions and you can file responses in accordance with the schedule that's been set.

All right. If there's nothing else, thank you for your time today.

MS. MCLANE: Thank you, Your Honor.

(The proceedings concluded at 4:11 p.m.)

CERTIFICATE OF OFFICIAL REPORTER

I, Amanda L. Longmore, Registered Professional Reporter and Federal Certified Realtime Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 25th day of February 2026

-S-

AMANDA L. LONGMORE, RPR, CRR, FCRR
FEDERAL OFFICIAL COURT REPORTER

**$4,710** [1] - 41:3
**1** [4] - 14:23; 31:24; 32:8; 48:14
**100** [3] - 2:12; 8:3; 24:8
**101** [2] - 2:13
**10th** [1] - 16:1
**11** [1] - 46:3
**11.3** [1] - 46:3
**11.4** [1] - 46:4
**1128** [1] - 19:2
**11th** [1] - 17:11
**137** [1] - 19:20
**16** [1] - 11:4
**16th** [1] - 18:18
**19** [1] - 3:20
**1974** [1] - 22:9
**1995** [1] - 19:3
**2** [2] - 45:1
**2.2** [2] - 39:18; 45:22
**2009** [1] - 25:16
**201** [1] - 19:23
**2022** [7] - 2:21; 3:16; 6:13; 15:3; 16:1; 33:22; 46:15
**2024** [3] - 4:12; 16:17; 18:19
**2025** [2] - 16:2, 23
**2026** [1] - 55:19
**21** [1] - 3:20
**24** [4] - 26:8; 30:8; 32:13, 19
**24th** [3] - 16:2, 18
**25th** [2] - 18:7; 55:19
**27th** [1] - 3:15
**28** [1] - 55:16
**28th** [17] - 2:24; 3:7; 24:18; 26:23; 27:9; 29:2; 30:5, 7, 14, 17; 31:3, 10; 32:17; 46:15, 25
**29th** [2] - 3:13; 53:24
**2:29** [1] - 2:2
**2nd** [1] - 3:18
**3** [2] - 31:24; 32:9
**3.d** [1] - 19:9
**31** [1] - 44:3
**3161(h** [1] - 22:13
**3161(h)(7** [1] - 23:20
**3161(h)(7)(B** [1] - 23:4
**33** [9] - 5:4; 9:22, 25; 10:9, 11, 13, 15; 14:15
**390** [1] - 19:18
**3:30** [1] - 46:7
**3:34** [1] - 46:10
**3:55** [1] - 46:9
**3:58** [1] - 46:10
**4** [1] - 47:6
**403** [1] - 28:11
**404(b** [4] - 28:7, 10; 29:6; 55:3
**407** [1] - 13:12
**438** [1] - 19:23
**447** [1] - 19:9
**46** [1] - 19:2
**4:11** [1] - 55:13
**4th** [16] - 2:21; 3:6, 9, 13; 24:18; 25:25; 26:25; 27:7; 28:25; 30:2, 18; 31:2, 13; 32:11; 33:17, 21
**5** [2] - 48:23; 52:23
**505** [1] - 14:23
**514** [1] - 13:12
**532** [1] - 18:5
**55** [1] - 19:18
**577** [1] - 13:11
**589** [1] - 25:14
**652** [1] - 14:23
**694** [1] - 25:15
**70** [4] - 5:18; 8:16; 22:10
**70-day** [2] - 8:13; 22:15
**734** [1] - 19:9
**753** [1] - 55:16
**8(a** [2] - 24:10; 31:21
**823** [1] - 19:21
**84** [1] - 13:11
**98** [1] - 2:12
**99** [2] - 2:12; 46:14
**9th** [1] - 18:13
**ability** [3] - 20:22; 48:18; 51:15
**able** [12] - 5:3; 7:10; 8:18; 10:7; 26:23; 27:3, 20; 44:19; 47:19; 49:6; 53:6, 22
**above-entitled** [1] - 55:17
**absent** [3] - 21:14; 34:15; 49:5
**abundantly** [1] - 52:7
**accepted** [2] - 16:22; 53:23
**access** [2] - 9:22; 37:12
**accommodate** [1] - 23:18
**accordance** [1] - 55:9
**accordingly** [1] - 14:11
**accosting** [1] - 49:3
**account** [1] - 23:14
**accounts** [1] - 3:24
**accurate** [2] - 9:23; 47:13
**accusation** [2] - 14:21, 24
**accused** [1] - 13:7
**accustomed** [1] - 37:4
**acknowledge** [2] - 5:9
**acknowledging** [1] - 21:4
**act** [2] - 24:12; 52:13
**Act** [8] - 5:17; 6:6; 9:1; 16:2; 22:7, 9; 23:16; 24:3
**acted** [2] - 47:25; 51:19
**action** [2] - 22:17; 51:21
**actions** [4] - 4:23; 34:8, 10; 42:5
**actively** [1] - 16:25
**activity** [1] - 34:16
**actual** [1] - 21:9
**acuity** [1] - 35:10
**addition** [1] - 14:7
**additional** [11] - 2:18; 8:9; 11:14; 17:4, 14; 18:10; 26:12; 40:1, 8; 44:19; 48:21
**addressed** [1] - 29:9
**adjacent** [1] - 52:25
**admissibility** [2] - 28:18; 41:5
**admissible** [2] - 28:2; 29:6
**advance** [2] - 17:9; 25:9
**advanced** [1] - 40:4
**advisement** [1] - 53:11
**afford** [1] - 39:2
**afforded** [2] - 27:22; 35:1
**afterwards** [2] - 39:20
**agent** [1] - 38:7
**agreed** [2] - 10:25; 40:23
**agreeing** [1] - 5:21
**akin** [1] - 38:1
**alert** [1] - 42:10
**aligned** [1] - 47:13
**allegation** [3] - 25:24; 27:1, 17
**allegations** [2] - 4:21; 26:4
**allege** [1] - 35:2
**alleged** [1] - 5:15
**allegedly** [2] - 25:5; 26:7
**allow** [1] - 32:3
**allowed** [1] - 40:2
**allows** [3] - 6:17; 31:22; 43:18
**almost** [5] - 6:14; 16:13; 19:14; 51:23; 52:5
**Amanda** [1] - 55:15
**AMANDA** [1] - 55:21
**Amendment** [8] - 2:14; 12:18; 13:6, 9; 21:8; 22:6; 36:22; 46:16
**Amendment's** [2] - 6:8; 36:18
**ammunition** [3] - 32:5; 38:16
**analysis** [17] - 5:14; 6:6, 9; 7:12; 14:10, 12, 17, 20; 15:22; 20:13; 28:10; 37:8; 38:20; 40:23; 43:24; 50:21
**angle** [2] - 48:15; 53:5
**angles** [1] - 40:12
**anticipate** [1] - 53:12
**anticipated** [1] - 46:1
**anticipation** [2] - 8:5; 37:25
**antiquity** [1] - 7:11
**anxiety** [2] - 20:10, 16
**anyway** [1] - 8:15
**apart** [1] - 42:22
**apologize** [3] - 45:22; 48:10; 53:21
**apparent** [6] - 20:20; 36:17; 37:13; 40:18; 47:7; 48:13
**appearance** [4] - 3:17; 7:21; 18:25; 22:11
**applies** [1] - 36:20
**apply** [2] - 37:10; 47:6
**appointed** [3] - 4:24; 7:21; 17:2
**appointment** [1] - 12:2
**appreciates** [1] - 42:6
**apprehends** [1] - 53:9
**approaches** [1] - 14:22
**appropriate** [5] - 9:12; 27:21; 37:10; 41:4; 43:25
**April** [1] - 18:18
**area** [4] - 39:7; 40:9; 41:14; 53:1
**arguable** [1] - 36:6
**arguably** [1] - 29:6
**argue** [1] - 36:13
**argues** [1] - 32:16
**argument** [9] - 2:4; 8:25; 9:14; 30:3; 32:15, 20; 35:16; 52:21
**arguments** [2] - 8:19; 47:5
**arises** [1] - 15:1
**arrest** [6] - 19:19; 43:18; 47:2; 49:14; 50:18
**arrested** [4] - 2:21, 24; 3:7, 13
**arrests** [1] - 29:15
**article** [1] - 36:20
**articulable** [3] - 46:22; 49:1; 52:13
**AS1** [1] - 42:4
**aspects** [2] - 27:1; 28:25
**assert** [5] - 12:13; 18:3, 6; 19:7, 25
**asserted** [3] - 12:11; 19:5, 16
**assertion** [9] - 6:24; 11:25; 13:25; 17:20, 22; 18:23; 19:12, 19; 22:2
**assertions** [1] - 33:3
**asset** [1] - 26:3
**assigned** [1] - 15:13
**assist** [1] - 7:10
**association** [1] - 31:9
**assuming** [2] - 26:20; 36:12
**attention** [2] - 27:21; 36:6
**Attorney** [1] - 4:22
**attorney** [6] - 4:11, 21; 5:9; 7:4, 24; 23:13
**Attorney's** [1] - 6:12
**attorney-client** [1] - 7:24
**August** [2] - 5:3; 17:11
**Austin** [1] - 4:20
**automobile** [1] - 34:4
**available** [2] - 32:14, 20
**aware** [1] - 12:9
**backseat** [2] - 39:5; 40:9
**bag** [1] - 53:2
**baggie** [1] - 38:5
**bail** [2] - 2:23; 3:2
**balance** [3] - 7:11; 14:2; 22:3
**balanced** [1] - 21:22
**balancing** [5] - 13:22; 14:8; 22:23; 23:5, 19
**Baltimore** [2] - 3:25; 36:25
**Banocy** [2] - 42:14

**bare** [1] - 14:19
**Barker** [22] - 6:9; 7:12; 13:12, 22; 14:4; 15:7, 9, 12, 18, 21; 17:17, 19, 25; 18:5; 20:2, 4; 21:3, 12, 16, 20; 22:4
**base** [2] - 45:3; 54:24
**based** [14] - 7:10; 9:10; 22:16; 24:12, 23; 28:12; 33:9, 22; 35:5; 43:5; 46:18; 51:20; 52:8
**bases** [1] - 34:21
**basic** [1] - 36:1
**basis** [8] - 6:15, 23; 24:4; 34:9; 40:25; 41:21; 49:10
**become** [1] - 17:4
**begin** [3] - 16:17; 17:10; 33:17
**beginning** [1] - 28:15
**behalf** [1] - 2:11
**behind** [2] - 34:25; 52:6
**believes** [2] - 42:15; 43:5
**below** [1] - 45:3
**benefits** [1] - 8:1
**best** [6] - 21:19; 22:17, 22; 23:22; 38:1; 48:15
**better** [1] - 8:1
**between** [15] - 10:1; 14:5; 15:2; 16:1, 10; 20:19; 24:20; 25:4; 27:20; 30:10; 31:25; 32:8; 49:7; 50:9, 13
**beyond** [4] - 6:4; 9:6, 15; 14:19
**bifurcated** [1] - 31:1
**bit** [8] - 30:21; 31:5; 33:20; 37:3; 40:14; 41:13; 47:12; 53:6
**black** [1] - 35:25
**blacked** [1] - 43:1
**blame** [1] - 15:12
**blocks** [1] - 24:23
**blue** [4] - 48:8; 50:23; 51:12; 53:3
**body** [7] - 2:22; 46:24; 47:10, 17; 49:4; 51:10, 17
**body-worn** [7] - 2:22; 46:24; 47:10, 17; 49:4; 51:10, 17
**boils** [1] - 51:2
**book** [1] - 48:17
**bottom** [3] - 37:18; 42:15; 45:3
**bounds** [1] - 13:9
**breathe** [1] - 6:17
**brief** [3] - 11:12; 34:4; 46:21
**briefly** [2] - 43:22; 51:8
**bright** [1] - 48:8
**brightness** [1] - 51:12
**bringing** [4] - 5:6; 6:5, 11; 31:13
**broad** [1] - 40:3
**Brooks** [1] - 19:8
**bulge** [3] - 47:22; 48:21; 52:15
**bullets** [1] - 44:18
**burden** [4] - 12:3; 13:2; 33:9
**Burgess** [1] - 14:22
**BWC** [6] - 45:19; 50:5, 10, 12; 51:4
**calendar** [2] - 5:2; 54:10
**camera** [7] - 2:23; 46:24; 47:17; 49:5; 51:10, 17; 53:5
**cameras** [1] - 47:10
**candid** [2] - 5:16; 6:16
**candidly** [2] - 9:9; 11:12
**cannot** [4] - 8:2; 21:17; 48:20; 52:14
**capture** [3] - 15:19; 50:5, 7
**captured** [1] - 50:9
**captures** [2] - 50:6
**car** [21] - 31:6, 9; 34:9, 25; 35:23; 36:2, 5, 8, 13; 37:1; 38:17; 39:4, 8; 40:2, 5, 9; 42:12, 18; 44:10; 49:13, 16
**carry** [1] - 54:17
**cars** [1] - 35:6
**cartridge** [1] - 32:4
**carved** [1] - 46:19
**case** [63] - 3:4, 20; 4:7, 14; 5:6, 9-10, 23, 25; 6:5, 12, 19-20; 7:10; 8:12, 15-16, 20; 10:22; 11:17; 12:23; 13:2; 14:13, 23; 15:1, 4, 6; 16:4, 9; 17:4, 12, 16; 18:5; 19:2, 8, 14, 22; 20:3; 21:2; 22:3, 5, 20, 25; 23:18; 24:3, 17, 21; 25:8, 16, 19, 23; 26:16; 27:13, 19; 29:14; 30:24; 37:16, 19; 40:22; 47:10, 14
**cases** [9] - 6:16; 14:25; 20:1; 25:8, 21; 27:16, 24; 38:2
**cash** [2] - 48:23; 52:5
**categorized** [1] - 15:14
**caused** [2] - 20:6; 21:16
**caution** [1] - 29:15
**CDF** [2] - 3:25; 12:8
**CDS** [5] - 50:16, 21, 23; 51:6
**Center** [1] - 4:4
**certain** [1] - 22:12
**certainly** [7] - 8:24; 9:10; 12:10, 23; 13:1; 21:13; 54:22
**CERTIFICATE** [1] - 55:14
**Certified** [1] - 55:15
**certify** [1] - 55:16
**chair** [1] - 44:11
**challenging** [2] - 49:16; 51:1
**chambers** [1] - 54:4
**change** [1] - 54:7
**character** [5] - 24:11; 25:11; 31:23; 37:13; 40:17
**charged** [1] - 24:11
**charges** [7] - 2:21, 25; 7:11; 11:14; 13:19; 29:14; 31:24
**charging** [1] - 26:16
**check** [4] - 39:7; 45:12, 16, 20
**checking** [1] - 45:24
**checks** [1] - 38:23
**chest** [1] - 50:7
**chronologically** [1] - 3:11
**chronology** [1] - 51:21
**Circuit** [9] - 13:10; 19:3, 11; 21:2, 7; 22:25; 24:14; 25:16; 32:23
**Circuit's** [1] - 32:23
**circumstance** [1] - 29:12
**circumstances** [6] - 27:19; 28:13; 29:15; 34:11; 40:21; 41:7
**citation** [2] - 25:12; 40:7
**cite** [3] - 19:2; 20:14; 25:8
**cited** [3] - 16:10; 19:14; 25:7
**cites** [3] - 20:16; 25:21
**City** [1] - 36:25
**city** [2] - 24:24; 25:1
**claim** [1] - 14:1
**claims** [1] - 7:7
**clarify** [2] - 28:5; 48:22
**clear** [7] - 7:14; 32:24; 34:23; 46:24; 47:15; 49:15; 52:7
**clearly** [2] - 47:20; 52:24
**client** [7] - 4:18; 7:8, 15, 24; 9:5; 27:22; 30:6
**clock** [8] - 5:11, 19, 21; 7:3, 23, 25; 8:14; 22:15
**closely** [3] - 29:17, 21, 24
**closer** [1] - 53:1
**closing** [1] - 51:24
**cloudy** [1] - 48:20
**code** [1] - 28:11
**colleague** [2] - 42:11, 17
**colleagues** [2] - 45:11; 50:15
**colors** [1] - 53:3
**coming** [5] - 35:6, 20; 41:2; 49:12; 53:19
**commerce** [1] - 32:6
**Commission** [1] - 4:22
**committed** [1] - 25:5
**common** [4] - 24:13; 25:3; 32:3, 8
**commonalities** [1] - 26:14
**commonality** [3] - 24:19; 25:4, 24
**commonly** [1] - 46:20
**communicate** [2] - 7:19; 20:23
**communicated** [1] - 18:19
**communication** [2] - 7:20; 8:4
**comparable** [1] - 19:22
**compartment** [1] - 24:21
**compelling** [2] - 9:19; 20:13
**complaint** [1] - 12:3
**completely** [3] - 29:20; 42:24; 43:1
**complex** [2] - 9:20; 15:3
**complexities** [1] - 29:7
**complexity** [2] - 15:1, 6
**compounding** [1] - 39:21
**computation** [1] - 22:13
**computations** [2] - 16:2; 18:22
**concern** [3] - 20:10, 16; 27:22
**concerned** [3] - 11:14; 39:20
**concerns** [2] - 29:8; 40:4
**concert** [3] - 7:24; 27:3; 28:10
**conclude** [3] - 30:7; 41:19; 53:14
**concluded** [1] - 55:13
**concludes** [2] - 30:5; 43:11
**conditions** [3] - 6:2; 21:4, 7
**conduct** [12] - 3:7-9, 15; 6:9; 10:11; 18:11; 25:19; 26:8; 34:19; 44:5; 46:21
**conducted** [4] - 9:5; 16:19; 22:23; 23:19
**conducting** [1] - 23:5
**Conference** [1] - 55:18
**conference** [5] - 11:22; 16:20; 28:14, 20; 53:20
**confinement** [1] - 21:5
**confirm** [1] - 50:12
**confirming** [1] - 45:6
**confirms** [2] - 42:16; 43:16
**conflict** [1] - 54:2
**conformance** [1] - 55:18
**confused** [2] - 41:14; 52:20
**confusing** [1] - 28:6
**connected** [5] - 24:12; 26:3, 8; 44:8, 17

**connection** [1] - 30:10
**consensual** [2] - 5:12, 15
**consent** [7] - 5:12; 7:3, 22; 9:3, 7, 16; 23:24
**consented** [1] - 16:12
**consenting** [2] - 7:4; 19:16
**consequence** [1] - 13:16
**consider** [5] - 13:23; 15:10; 17:19; 20:5; 23:5
**consideration** [6] - 6:19; 14:4; 16:22; 20:7; 23:21; 27:21
**considered** [1] - 16:21
**constantly** [1] - 37:2
**constitute** [3] - 24:13; 34:4; 36:22
**constitutional** [3] - 6:20; 9:13; 27:22
**consult** [1] - 5:20
**consulted** [1] - 7:2
**contact** [4] - 4:11, 16; 12:2, 6
**contained** [1] - 17:13
**containing** [1] - 3:15
**contemporaneous** [2] - 4:17; 44:1
**contemporaneously** [2] - 22:24; 38:22
**contended** [1] - 25:17
**contents** [1] - 47:20
**context** [1] - 30:24
**continuance** [7] - 16:13; 22:14, 16, 21, 24; 23:6, 9
**continuances** [3] - 15:25; 19:17; 23:17
**continuation** [1] - 23:7
**continuity** [1] - 23:12
**contraband** [1] - 46:25
**contradicting** [1] - 51:9
**contravenes** [1] - 13:20
**control** [1] - 32:18
**controls** [1] - 49:5
**conversation** [1] - 7:24
**conversations** [1] - 11:12
**convictions** [1] - 28:17
**copies** [1] - 49:22
**correct** [13] - 2:15; 8:7, 10; 9:24; 10:2, 5; 31:7; 47:25; 51:13; 52:18; 54:19; 55:17
**Correctional** [1] - 4:3
**corroborates** [2] - 42:17; 43:4
**corroboration** [1] - 42:12
**counsel** [45] - 3:23; 4:6, 15, 17; 5:20, 24; 7:16; 8:6; 9:3, 5, 11, 20; 10:20; 11:3, 5, 7, 12, 14; 12:5, 10, 19; 16:11, 14, 20, 24; 17:1-3, 7; 18:18; 23:10, 12; 28:22; 32:21; 42:6, 8, 22; 43:8; 51:13; 52:12
**counsel's** [2] - 18:16; 43:25
**count** [1] - 27:20
**counts** [6] - 24:9; 25:18; 29:5; 31:1; 32:10
**Counts** [2] - 31:24; 32:8
**couple** [1] - 38:9
**course** [5] - 4:23; 7:1; 8:13; 19:7; 54:10
**COURT** [49] - 2:4, 15; 7:14; 8:7, 21, 23; 9:25; 10:3; 13:4, 6; 25:12; 28:1, 5, 8; 29:8, 20; 30:12, 19, 22; 31:4, 8, 17; 33:12, 14; 35:15; 41:9, 11; 43:21; 44:24; 45:15, 20; 46:7, 11; 49:15, 19, 25; 50:2; 51:7; 52:18; 53:10, 17; 54:1, 6, 11, 18, 20; 55:4, 7, 21
**court** [3] - 4:16; 12:1; 25:22
**Court** [79] - 2:11, 20; 4:5; 5:7, 11, 20; 6:8, 25; 8:3, 12, 15; 9:4; 12:2, 6; 13:11, 13, 21-22; 14:5, 11, 18, 20; 15:10, 17; 16:17, 19; 17:19, 25; 18:2, 15, 25; 20:5, 7, 24; 21:3, 14, 17; 22:5, 15, 19; 23:1, 5, 16, 18-19, 21; 24:2; 25:9; 26:11, 20; 27:4; 28:10, 12, 16, 19; 29:5, 15; 34:2, 6; 36:14, 20; 37:7, 9, 14; 43:20; 46:3, 19; 48:4, 18, 22; 49:24; 51:10, 18; 52:1, 10; 54:8; 55:16
**Court's** [6] - 2:8, 19; 4:15; 5:2; 30:23; 34:7
**courts** [1] - 15:20
**covered** [1] - 31:20
**COVID** [1] - 21:6
**crack** [1] - 38:2
**created** [1] - 48:17
**credible** [1] - 50:25
**credibly** [1] - 51:3
**credit** [1] - 52:11
**credits** [1] - 18:15
**crime** [3] - 39:25; 40:20; 48:25
**criminal** [6] - 9:6; 13:7, 16; 15:11; 27:13; 34:16
**Criminal** [1] - 24:9
**criminality** [2] - 38:4; 40:1
**cross** [3] - 27:9, 11; 34:20
**cross-examination** [2] - 27:9, 11
**CRR** [1] - 55:21
**crux** [1] - 9:14
**crystal** [1] - 46:24
**cuffed** [1] - 53:4
**curative** [2] - 29:16; 32:25
**currency** [5] - 43:19; 47:23; 48:25; 52:9, 25
**custody** [4] - 3:21; 5:5; 20:18
**cutting** [1] - 38:7
**dangerous** [1] - 21:6
**dark** [2] - 41:16; 48:19
**date** [8] - 16:23; 24:18; 28:2; 30:15; 31:5; 53:20; 54:7
**Dated** [1] - 55:19
**dates** [3] - 15:2; 25:2; 26:17
**daylight** [1] - 40:4
**days** [9] - 5:18; 8:16; 13:14; 22:10; 26:8; 30:8; 32:13, 19
**deadline** [3] - 10:25; 17:6; 53:18
**deal** [1] - 9:6
**dealing** [3] - 24:22; 36:9; 37:20
**December** [1] - 5:2
**decide** [1] - 14:11
**decided** [1] - 50:16
**decidedly** [1] - 52:8
**decisions** [2] - 26:16; 28:21
**declare** [1] - 45:5
**declares** [1] - 44:11
**deep** [1] - 32:22
**default** [1] - 46:16
**defendant** [45] - 13:1; 14:1; 15:2, 7, 11; 17:1, 9, 24; 18:1, 4, 6, 9, 12, 16-17, 20; 19:5, 15, 21, 24; 20:3, 6, 11, 14, 20; 21:4, 10, 23, 25; 22:18, 22; 23:10-12, 22; 27:13; 32:1; 42:18; 45:9; 50:13, 17; 51:1
**defendant's** [20] - 13:15, 17; 14:3; 16:11, 20, 24; 17:3, 5, 7, 22; 18:15, 23; 19:1, 12; 20:25; 22:11; 23:2; 50:16, 24; 51:5
**defendants** [2] - 12:5, 12
**defense** [32] - 3:24; 7:25; 9:3, 20; 10:20; 11:3, 12; 12:19; 16:6, 12, 14, 16, 23; 17:17; 18:20; 20:7, 11, 15; 23:25; 26:21; 32:11, 21; 41:13, 24; 42:6, 13, 22; 43:8; 45:1; 50:11; 51:9
**Defense** [3] - 48:14, 22; 52:23
**defense's** [3] - 17:14; 23:23; 24:4
**delay** [30] - 6:5, 11, 15, 23; 11:10; 13:20, 23; 14:5, 9, 12, 16, 18, 21, 24; 15:5, 10, 12, 14, 19, 23; 17:12; 18:25; 19:12; 20:6, 16; 21:23; 22:14, 19
**delayed** [1] - 17:16
**delaying** [1] - 7:1
**delineate** [1] - 27:4
**demand** [1] - 18:1
**demanded** [1] - 4:25
**demonstrate** [2] - 34:18; 46:23
**denied** [1] - 18:4
**deny** [4] - 23:10-12; 24:4
**deprived** [1] - 17:24
**desire** [2] - 18:16; 33:1
**desired** [1] - 18:9
**despite** [2] - 6:12; 13:15
**detain** [1] - 34:14
**detained** [1] - 3:18
**Detective** [6] - 50:4, 10, 14-15, 22; 51:3
**detective** [2] - 45:5, 10
**detention** [4] - 20:18, 25; 21:15; 34:3
**determine** [7] - 4:21; 13:10, 20; 14:6; 15:11; 46:2; 47:20
**determined** [2] - 13:19; 20:1
**determining** [5] - 17:23; 29:4; 34:6; 37:9; 40:17
**developed** [1] - 13:21
**died** [1] - 10:9
**difference** [3] - 31:25; 50:8
**different** [11] - 15:13; 20:21; 26:17; 27:16; 32:1; 35:6; 37:4; 38:20; 40:12
**differently** [1] - 30:21
**difficult** [2] - 4:16; 18:4
**difficulty** [1] - 7:9
**diligence** [1] - 23:15
**dip** [4] - 39:7; 45:10, 12, 17
**direction** [1] - 35:21
**directions** [1] - 35:7
**discharged** [2] - 4:18; 17:1
**disclose** [2] - 16:3, 5
**disclosed** [1] - 16:6
**discovery** [4] -

8:17; 15:4; 16:5
**discuss** [2] - 16:9; 24:5
**discussed** [1] - 9:8
**discussion** [1] - 16:10
**discussions** [1] - 11:16
**dismiss** [2] - 23:2; 24:4
**dismissal** [7] - 2:6; 7:13; 9:10; 13:2, 18; 15:8; 18:13
**disposition** [1] - 17:16
**disqualified** [1] - 40:11
**distinct** [2] - 27:18; 37:3
**distribute** [1] - 3:2
**distribution** [3] - 26:6; 38:7
**District** [4] - 21:3; 24:24; 55:16
**district** [1] - 19:9
**divide** [1] - 27:20
**docket** [1] - 3:5
**doctrine** [2] - 36:19; 47:6
**Doe** [2] - 10:8
**Doggett** [2] - 14:22
**done** [3] - 7:23; 30:11; 42:8
**door** [2] - 40:9; 44:13
**doubt** [2] - 26:24; 50:12
**dovetails** [1] - 11:9
**down** [2] - 40:11; 51:2
**dozen** [1] - 48:6
**drawn** [5] - 31:15; 35:9, 13-14; 36:4
**drive** [2] - 4:2, 4
**driver** [1] - 30:2
**driving** [2] - 35:6, 20
**drug** [4] - 3:1; 24:22; 26:6
**drugs** [6] - 25:25; 31:10; 48:10; 52:5, 15, 20
**due** [6] - 5:1, 7-8; 23:15, 21
**during** [11] - 4:8; 5:22, 25; 16:12; 20:18; 21:5; 28:19; 29:4; 34:3; 42:5
**e-mail** [2] - 54:3, 9
**ECF** [4] - 2:12; 24:8; 46:14
**edification** [1] - 2:19
**effect** [1] - 20:20
**effective** [1] - 23:14
**efficient** [1] - 8:2
**efforts** [1] - 11:22
**eight** [3] - 14:24; 19:14; 50:8
**either** [9] - 15:14; 21:18; 22:2, 20; 28:2, 14; 54:4
**Elleby** [6] - 10:11; 50:5, 10, 14-15, 22
**Elleby's** [1] - 51:3
**emblazoned** [2] - 39:15, 23
**emblazoning** [1] - 46:5
**emphasized** [1] - 18:3
**empty** [1] - 38:5
**encounter** [1] - 33:22
**encounters** [2] - 15:1; 29:3
**encourage** [1] - 48:4
**end** [5] - 11:18, 22; 28:15; 37:17; 42:15
**endeavored** [1] - 52:1
**ended** [1] - 47:25
**ends** [6] - 5:13; 9:1; 22:16, 21, 23; 23:19
**enforcement** [2] - 8:20; 15:2
**enjoy** [1] - 13:8
**entering** [1] - 40:15
**entirety** [1] - 29:3
**entitled** [2] - 17:23; 55:17
**escalate** [1] - 49:1
**essence** [2] - 4:9; 5:21
**essential** [1] - 7:7
**essentially** [2] - 4:10; 48:17
**establish** [3] - 14:2; 21:8; 26:10
**event** [1] - 39:20
**events** [5] - 19:7; 24:19; 25:20; 47:13; 51:21
**eventually** [1] - 4:24
**evidence** [11] - 10:16; 17:15; 28:1; 31:8; 32:14, 18; 35:16; 40:20; 41:2; 45:23; 51:9
**evidentiary** [1] - 17:23
**exact** [1] - 42:12
**exactly** [3] - 42:7; 47:23
**examination** [2] - 27:9, 11
**example** [2] - 22:13; 27:6
**exception** [2] - 37:10; 46:20
**excludable** [1] - 22:19
**excluded** [1] - 22:12
**exclusion** [6] - 15:25; 17:13; 18:8, 14, 21; 41:7
**excuse** [2] - 43:3, 15
**exercise** [1] - 23:14
**Exhibit** [6] - 39:18; 45:1; 48:14, 23; 52:23
**exhibit** [3] - 37:20; 45:23; 48:9
**exhibits** [7] - 11:2; 12:15, 22; 24:23; 46:1, 3; 49:22
**exist** [1] - 30:4
**experience** [2] - 21:1; 43:5
**experiences** [1] - 39:13
**expert** [3] - 32:3, 5, 8
**explained** [2] - 24:2; 33:21
**explanation** [1] - 36:9
**explicit** [1] - 13:15
**extend** [1] - 10:25
**extended** [3] - 6:5; 37:20; 45:2
**extent** [2] - 14:18; 40:7
**eyes** [6] - 35:8, 13, 22; 36:4, 7; 50:7
**F.3d** [3] - 19:2, 21, 23
**F.4th** [2] - 13:11; 19:18
**facilities** [1] - 4:8
**facility** [1] - 53:23
**fact** [19] - 2:22; 4:20; 25:4; 26:18; 31:11; 32:7, 13; 36:25; 38:17; 42:6, 10; 43:17; 47:9; 50:8, 12; 51:10; 52:6
**factor** [21] - 14:4, 8; 15:7, 9, 18, 21; 17:17, 19; 19:4; 20:2, 4-5, 8; 21:3, 16-17, 22-23, 25; 22:2; 38:4
**factors** [10] - 12:23; 14:3, 7; 21:20; 22:4; 23:5; 26:12; 29:14; 30:25; 34:7
**factual** [4] - 9:11, 15, 17
**faculty** [1] - 53:24
**fails** [1] - 18:1
**failure** [3] - 18:3; 23:6, 9
**fair** [2] - 27:23
**falling** [1] - 30:9
**familiar** [1] - 17:4
**family** [1] - 20:23
**far** [1] - 22:8
**fashion** [1] - 8:2
**faster** [1] - 8:1
**favor** [13] - 10:19; 12:25; 14:3; 15:7; 17:18; 19:6; 20:4; 21:17, 19, 23-24; 22:1, 3
**FCRR** [1] - 55:21
**February** [5] - 16:1, 18, 23; 18:7; 55:19
**federal** [4] - 3:3; 4:18; 12:1
**FEDERAL** [1] - 55:21
**Federal** [2] - 24:9; 55:15
**feet** [1] - 44:14
**few** [5] - 2:18; 24:23; 44:14; 53:8; 55:2
**figure** [1] - 44:19
**file** [7] - 5:25; 17:5, 9; 18:12; 54:21; 55:8
**Filed** [1] - 2:3
**filed** [13] - 2:11; 3:14; 11:3; 14:14; 15:24; 18:7; 19:15; 23:23; 54:18, 25
**filing** [2] - 8:14; 38:13
**filings** [2] - 2:17; 10:6
**finally** [1] - 11:24
**findings** [2] - 22:16; 23:1
**firearm** [19] - 2:22; 3:1; 25:19; 30:7, 17; 32:12; 34:1; 38:25; 42:18, 20; 43:3, 13; 44:8, 12, 15; 45:4, 9, 12
**firearms** [4] - 24:22; 32:1, 4, 6
**first** [10] - 2:6; 3:12; 11:25; 14:4, 11; 15:7; 19:15; 20:9; 21:22; 48:7
**five** [2] - 4:4; 49:20
**five-hour** [1] - 4:4
**flag** [1] - 15:19
**flashing** [2] - 37:1; 52:14
**flashlight** [2] - 40:14; 42:15
**fleeting** [1] - 51:14
**flew** [1] - 54:5
**flip** [2] - 26:25; 48:17
**focus** [1] - 15:21
**focused** [1] - 36:6
**focusing** [1] - 15:15
**folded** [2] - 47:23; 52:25
**folded-up** [1] - 47:23
**footage** [5] - 26:23; 46:24; 47:15; 48:5
**Footnote** [1] - 14:23
**foray** [1] - 11:25
**forbid** [1] - 37:5
**foregoing** [1] - 55:16
**forever** [1] - 18:1
**forfeiture** [1] - 26:3
**forgive** [2] - 25:7, 15
**forgot** [1] - 54:10
**format** [1] - 55:18
**former** [5] - 9:5; 11:5, 13-14; 16:11
**formulated** [1] - 5:17
**forth** [1] - 22:19
**forward** [4] - 4:21; 8:1; 42:20; 49:24
**four** [10] - 2:12; 6:9; 12:24; 13:22; 14:2, 7; 18:24; 19:21; 21:20; 37:1
**four-part** [2] - 6:9; 13:22
**Fourth** [13] - 13:10; 19:3, 11; 21:2, 7; 22:25; 24:13; 25:16; 32:23; 36:18, 22; 46:16
**fourth** [5] - 13:25; 20:5; 21:3, 16; 22:2
**frame** [10] - 6:22; 47:19; 48:6; 50:20-22; 51:15
**frame-by-frame** [1] - 51:15
**front** [15] - 33:23; 34:22, 25; 35:2, 12, 24-25; 36:4, 16; 41:14, 20-21, 23; 42:2
**fruit** [6] - 40:25; 41:6; 47:3; 49:10, 16, 18
**fruitless** [1] - 8:6
**frustrated** [1] - 12:5
**fulcrum** [1] - 44:22
**fulfilled** [1] -

11:19
**fully** [1] - 42:3
**funds** [1] - 26:2
**furtherance** [2] - 3:24; 26:5
**gap** [1] - 35:9
**gate** [1] - 51:24
**gaze** [1] - 36:8
**geared** [1] - 48:7
**general** [2] - 5:8; 21:7
**generalized** [1] - 20:17
**generally** [2] - 20:22; 29:8
**given** [3] - 7:23; 22:1; 50:7
**Glock** [11] - 38:15; 39:14, 18-19, 23-24; 42:16, 21, 23; 46:6
**God** [1] - 37:5
**goodness** [2] - 5:24
**Government** [48] - 3:5, 11; 4:13; 10:13, 22-25; 11:1, 10-11, 20; 12:6, 14, 19; 15:11, 24; 16:3, 5, 10, 14, 21; 17:16, 18; 19:6; 20:4; 21:24; 22:1, 3, 10; 23:11, 13; 25:17, 21; 31:25; 33:2; 34:18; 37:11; 39:16; 43:25; 44:25; 45:25; 48:8; 51:13; 52:12; 54:13, 25
**Government's** [12] - 10:19, 22; 12:25; 13:18; 15:23; 17:13; 18:8, 14, 21; 21:19; 38:13; 54:16
**grabbed** [1] - 47:2
**grant** [5] - 23:6, 9; 26:20; 54:13
**granted** [7] - 15:25; 16:15; 17:7; 22:14; 23:17, 20
**granting** [3] - 22:21, 24; 33:9
**grave** [1] - 27:21
**great** [1] - 49:25
**Grievance** [1] - 4:22
**Grimmond** [1] - 19:20
**GRIMMOND** [1] - 19:20
**grounds** [1] - 15:8
**guarantee** [1] - 6:8
**guess** [3] - 28:19; 33:16; 46:8
**guidance** [2] - 25:22; 53:7
**guilt** [1] - 29:4
**gun** [17] - 24:20; 26:4, 7; 28:1; 29:23; 30:7, 14, 16; 37:17; 38:19, 24; 39:1, 8-9; 42:11; 44:17
**habitually** [1] - 4:15
**hac** [1] - 36:9
**half** [1] - 46:8
**hammer** [1] - 37:7
**hamper** [1] - 17:17
**handgun** [7] - 28:17; 43:6, 16-17; 45:8, 14
**handguns** [1] - 32:3
**handle** [1] - 37:18
**harm** [1] - 21:16
**Hart** [1] - 22:25
**hawk** [1] - 15:17
**Hawkins** [2] - 25:8, 12
**head** [1] - 4:12
**hear** [2] - 2:4; 27:18
**heard** [4] - 45:19; 46:11; 55:3, 8
**Hearing** [1] - 4:20
**hearing** [7] - 8:5; 10:25; 16:19; 17:8; 18:11; 37:25
**height** [1] - 21:5
**held** [5] - 3:2; 21:7; 28:14; 36:20; 55:17
**help** [1] - 48:22
**hereby** [1] - 55:16
**hidden** [1] - 52:5
**high** [1] - 29:24
**higher** [1] - 29:22
**himself** [3] - 9:20; 27:8; 42:16
**hinge** [1] - 13:14
**historically** [1] - 47:11
**hole** [1] - 35:9
**home** [2] - 6:3; 50:14
**Honor** [84] - 2:8, 10, 13, 16; 3:11, 22; 5:13; 6:7, 16; 7:5, 8, 18, 22; 8:2, 4, 11, 24-25; 10:6, 18; 11:2, 9, 21; 12:17; 13:5; 24:7; 25:7, 14; 27:14, 25; 28:4, 9, 13, 24; 29:11; 30:1, 20; 31:7, 11, 19; 32:10; 33:11, 13, 18; 34:2; 35:19; 37:19; 38:2; 39:11, 16, 22; 40:23; 41:10, 12; 43:22; 44:25; 45:21; 46:13, 16; 47:8; 48:3, 11, 24; 49:4, 8, 23; 50:1, 3; 51:8, 11, 20; 52:4, 17, 22, 24; 53:15; 54:12, 23; 55:12
**Honor's** [2] - 28:23; 55:5
**hope** [1] - 26:22
**hour** [2] - 4:2, 4
**hours** [1] - 46:8
**housed** [2] - 3:25; 4:8
**hunch** [4] - 47:25; 48:1; 51:20
**idea** [2] - 10:20; 45:5
**identical** [1] - 26:13
**identically** [1] - 26:25
**identified** [3] - 20:7; 22:8; 34:25
**identify** [2] - 8:19; 39:13
**illegal** [5] - 37:23; 38:17; 41:6; 42:24; 44:21
**illegality** [1] - 38:18
**image** [2] - 38:9; 52:2
**immediately** [6] - 36:17; 37:13; 38:24; 42:20; 47:7; 51:5
**impactful** [1] - 20:12
**impaired** [1] - 20:11
**impartial** [1] - 27:23
**impermissible** [4] - 30:25; 33:23; 41:19; 43:7
**implicated** [1] - 36:19
**implicating** [1] - 36:22
**importance** [1] - 15:20
**important** [2] - 38:12; 46:20
**importantly** [7] - 34:18; 38:20; 39:11; 47:16; 48:22; 52:3
**impossible** [2] - 13:9; 23:8
**imprecise** [1] - 13:16
**improper** [1] - 15:15
**in-person** [1] - 4:6
**inaction** [1] - 4:19
**inactivity** [1] - 5:8
**inappropriate** [1] - 33:10
**inarticulable** [1] - 47:24
**inattention** [2] - 4:19; 6:4
**incarcerated** [3] - 7:9; 10:12; 20:23
**incarceration** [3] - 6:14; 20:10; 21:11
**inception** [1] - 34:8
**inches** [1] - 50:8
**incidence** [1] - 34:15
**incidences** [1] - 27:18
**incident** [7] - 24:25; 27:9; 28:25; 30:2; 31:2, 14; 43:18
**incidents** [2] - 25:5; 27:16
**inclined** [1] - 2:6
**include** [2] - 3:8; 49:12
**included** [2] - 45:4; 52:23
**including** [2] - 3:20; 23:6
**incongruity** [1] - 49:6
**inconsistent** [1] - 52:11
**incriminating** [4] - 36:16; 37:13; 40:17; 47:7
**independent** [1] - 12:11
**independently** [1] - 5:14
**indicate** [2] - 26:12; 47:17
**indicated** [3] - 2:10; 7:2; 25:3
**indicates** [2] - 44:6; 51:23
**indicating** [1] - 30:18
**indication** [3] - 11:17; 15:4; 17:15
**indicative** [2] - 31:12; 48:25
**indicia** [2] - 38:4; 40:1
**indictment** [13] - 3:6, 8, 10, 12, 14; 7:13; 10:1; 14:5, 14; 16:7; 19:15, 25; 22:10
**individual** [1] - 45:11
**individuals** [1] - 34:3
**indulgence** [1] - 2:8
**ineffective** [1] - 9:9
**inference** [1] - 35:17
**inferences** [1] - 31:14
**Infiniti** [2] - 32:13; 45:9
**influence** [1] - 31:16
**information** [3] - 2:18; 33:5; 40:4
**infringement** [1] - 37:6
**inherently** [1] - 44:21
**initial** [5] - 7:21; 18:24; 22:11; 34:11; 41:13
**initiating** [1] - 35:4
**innocence** [1] - 29:4
**innocuous** [2] - 38:9; 42:24
**inside** [3] - 32:4; 35:8; 52:24
**insignificant** [1] - 10:14
**insofar** [1] - 8:4
**instance** [2] - 16:13; 41:18
**instances** [1] - 24:17
**instant** [1] - 14:12
**instead** [2] - 20:16; 39:1
**instinctive** [1] - 36:2
**instinctively** [1] - 52:13
**institutions** [2] - 20:19, 22
**instructions** [4] - 29:9, 11, 16; 32:25
**instructs** [1] - 15:12
**insufficient** [5] - 26:10; 33:3; 40:20; 44:18; 48:1
**intent** [2] - 3:1; 15:15
**interaction** [5] - 41:1; 49:2, 11; 50:19
**interest** [3] - 22:17, 22; 23:22
**interestingly** [1] - 37:15
**interests** [2] - 20:7, 12
**interior** [1] - 48:15
**interpreted** [1] - 24:14
**interrelated** [1] - 32:10
**interstate** [1] - 32:6
**intertwined** [4] - 29:7, 17, 21, 25
**introduce** [1] - 48:9
**introduced** [1] - 46:4

**invasion** [1] - 36:21
**investigation** [3] - 40:8; 42:8, 12
**investigative** [1] - 46:22
**involve** [1] - 36:21
**involved** [1] - 5:9
**involvement** [1] - 6:12
**involves** [1] - 24:21
**involving** [1] - 38:2
**irrespective** [1] - 5:12
**issue** [11] - 2:19; 9:2; 12:10; 21:12; 30:9; 32:24; 33:2, 10; 38:15; 48:7
**issued** [1] - 46:18
**issues** [4] - 9:13, 17; 31:21; 54:8
**issuing** [1] - 53:12
**item** [3] - 38:18; 40:18, 20
**items** [3] - 48:12; 53:7
**itself** [1] - 37:23
**Jail** [1] - 4:1
**jail** [2] - 4:6; 6:2
**January** [2] - 11:23; 16:18
**John** [2] - 10:8
**joinder** [4] - 24:10; 26:11; 30:25; 31:22
**joined** [2] - 25:18; 31:16
**Judge** [2] - 4:20; 16:15
**judge** [1] - 22:15
**Judicial** [1] - 55:18
**July** [1] - 53:24
**jump** [2] - 9:18; 36:1
**jumps** [1] - 35:11
**juror** [2] - 26:22; 27:3
**jurors** [1] - 27:18
**jury** [4] - 27:23; 29:16; 30:5; 32:24
**justice** [8] - 5:13; 9:2; 11:18; 22:16, 21, 23; 23:8, 19
**justification** [1] - 34:13
**justified** [2] - 34:8, 11
**K9** [1] - 51:2
**keeping** [2] - 31:15; 46:1
**keys** [2] - 31:12; 49:12
**kind** [2] - 45:25; 48:9
**knowingly** [2] - 30:8, 18
**knowledge** [1] - 9:16
**knows** [5] - 2:20; 33:19; 34:2; 43:6; 46:16
**labeled** [1] - 49:23
**lack** [3] - 34:22, 24; 36:7
**lackadaisical** [1] - 6:18
**lacked** [1] - 36:15
**lacking** [1] - 20:17
**languished** [1] - 6:20
**large** [1] - 46:19
**last** [3] - 22:25; 28:15; 33:15
**lastly** [2] - 7:5; 33:1
**late** [1] - 19:7
**latest** [1] - 6:13
**latter** [2] - 4:12; 24:15
**law** [7] - 8:20; 15:2; 33:20; 37:16; 42:2; 43:7, 13
**lawful** [1] - 37:12
**lawfully** [2] - 36:13; 37:11
**Lawyer** [4] - 31:18; 41:11; 44:24; 50:2
**lawyer** [1] - 6:3
**LAWYER** [5] - 31:19; 41:12; 44:25; 45:18; 50:3
**lawyers** [1] - 6:3
**leads** [1] - 9:13
**learned** [1] - 39:21
**learning** [1] - 19:24
**least** [7] - 14:21; 42:10; 45:19; 48:6; 50:11; 52:21; 54:16
**left** [2] - 4:10; 47:11
**legal** [3] - 4:9; 27:4
**legality** [1] - 8:19
**legitimate** [1] - 6:23
**length** [7] - 5:6; 11:15; 13:23; 14:5, 9, 12; 15:5
**lengthy** [1] - 6:15
**less** [3] - 3:17; 19:22; 21:1
**level** [2] - 6:3; 12:18
**license** [6] - 35:10, 24; 36:7; 37:3; 41:20
**light** [1] - 4:25
**lights** [1] - 37:2
**likely** [4] - 23:7; 37:22; 43:6; 47:21
**limine** [5] - 28:16; 41:4; 53:18; 54:13, 25
**limines** [1] - 11:4
**limitation** [1] - 27:12
**limited** [6] - 15:1, 6; 20:22; 34:5, 17; 36:12
**limiting** [2] - 29:9, 11
**line** [1] - 42:4
**list** [1] - 23:4
**litigants** [1] - 15:19
**litigation** [1] - 16:25
**loaded** [5] - 43:6, 13, 17; 45:8, 14
**locates** [1] - 43:16
**location** [1] - 35:13
**logical** [1] - 24:15
**logically** [1] - 32:10
**LONGMORE** [1] - 55:21
**Longmore** [1] - 55:15
**look** [8] - 26:23; 34:7; 35:22; 37:8; 39:16, 22; 40:11; 51:17
**looking** [8] - 10:14; 25:10; 30:21; 35:12, 21; 42:9; 44:1, 14
**looks** [4] - 38:23; 42:15; 52:6; 53:2
**loud** [1] - 15:17
**magazine** [37] - 33:24; 34:1; 36:16; 37:16, 20, 23; 38:14, 16-17; 39:10, 13, 15, 18, 23; 40:13; 42:16, 21, 23; 43:3, 6, 11-12; 44:7, 12, 17, 21; 45:2, 6-7, 13; 46:6
**Magistrate** [1] - 4:20
**mail** [2] - 54:3, 9
**main** [1] - 9:4
**malfeasance** [1] - 26:4
**manner** [1] - 20:17
**marijuana** [2] - 38:2, 8
**marked** [1] - 11:2
**marking** [3] - 12:21; 39:18
**Marshals** [1] - 4:1
**Maryland** [4] - 42:2; 43:7, 13; 55:16
**material** [1] - 50:9
**materials** [1] - 38:6
**math** [1] - 3:21
**matter** [10] - 4:17; 6:1; 7:1; 9:21; 25:17; 28:14; 34:4; 35:23; 51:13; 55:17
**matters** [7] - 3:19; 4:19; 5:1; 8:4; 27:7; 29:13; 31:16
**McLane** [3] - 8:23; 45:24; 50:2
**MCLANE** [13] - 8:24; 10:2, 5; 53:15, 21; 54:2, 7, 9, 12, 19, 21; 55:1, 12
**McLane's** [1] - 20:13
**mean** [4] - 29:21; 45:22; 52:18
**means** [2] - 37:21; 44:13
**mechanism** [1] - 9:6
**mechanisms** [1] - 12:4
**members** [1] - 36:25
**mention** [1] - 7:9
**met** [2] - 13:1; 33:9
**middle** [2] - 50:6; 52:12
**might** [7] - 28:24; 29:1; 31:12; 39:9; 49:6
**mimic** [1] - 30:9
**minimum** [1] - 14:19
**minute** [1] - 43:11
**minutes** [1] - 50:20
**miscarriage** [1] - 23:8
**missed** [1] - 25:13
**mistaken** [1] - 52:19
**molasses** [3] - 6:18; 12:20
**molasses-like** [1] - 6:18
**moment** [4] - 39:22; 44:1, 4; 52:14
**moments** [1] - 37:5
**money** [1] - 52:20
**month** [1] - 30:16
**months** [21] - 3:20; 5:4; 9:22, 25; 10:9, 11, 13, 15; 13:14; 14:13, 15, 24; 16:7; 18:13, 24; 19:15, 21, 24; 44:3
**moreover** [1] - 18:15
**most** [7] - 9:19; 20:12; 23:23; 38:20; 47:16, 20; 48:22
**mostly** [1] - 15:23
**motion** [17] - 2:6; 8:8; 11:3; 16:15; 18:8, 12, 14, 21; 23:2, 21; 24:4, 6; 36:5; 41:4; 46:12, 14
**motions** [27] - 2:5, 12; 5:12, 25; 8:9, 14; 10:25; 15:24; 16:19; 17:5, 8, 10, 13; 18:11; 23:23; 24:1; 26:21; 28:16; 33:15; 53:11, 18; 54:13, 24; 55:8
**motivated** [1] - 6:22
**move** [2] - 5:3; 33:15
**moved** [2] - 4:1; 12:20
**moves** [2] - 36:8; 44:11
**moving** [1] - 8:1
**MR** [40] - 2:8, 16; 7:18; 8:11, 22; 13:5; 24:7; 25:14; 28:4, 7, 9; 29:11; 30:1, 17, 20, 23; 31:7, 11, 19; 33:13, 18; 35:19; 41:10, 12; 43:22; 44:25; 45:18, 21; 46:13; 49:18, 23; 50:1, 3; 51:8; 52:22; 53:16; 54:8, 24; 55:2, 5
**MS** [13] - 8:24; 10:2, 5; 53:15, 21; 54:2, 7, 9, 12, 19, 21; 55:1, 12
**multiple** [1] - 20:19
**must** [19] - 14:2, 5, 11, 18; 15:11, 14; 17:19; 20:3, 5; 21:22; 22:23; 23:1; 30:11; 31:25; 33:5; 34:6, 18; 37:11; 44:19
**muted** [1] - 53:3
**NAC** [1] - 53:24
**nail** [1] - 37:8
**narcotics** [2] - 32:17; 50:18
**naturally** [2] - 35:9; 45:3
**nature** [9] - 5:12, 15; 13:16; 33:6; 36:16; 38:18; 47:7; 48:12; 51:11

**near** [1] - 26:10
**neared** [1] - 16:23
**necessarily** [2] - 21:20; 31:13
**necessary** [8] - 14:9; 16:3-5; 21:21; 23:13, 18; 40:25
**Neck** [1] - 4:1
**need** [3] - 7:6; 35:3; 40:19
**needed** [6] - 4:14; 8:9; 14:19; 17:7; 18:10; 40:8
**needs** [3] - 23:18; 33:4
**negotiations** [1] - 5:7
**neutral** [5] - 13:1; 15:15; 21:19; 22:2; 26:22
**neutrally** [1] - 21:18
**never** [6] - 7:16, 19-20; 10:13; 11:6; 26:15
**new** [4] - 17:1, 3, 7
**next** [4] - 3:24; 4:14; 14:18; 49:20
**nexus** [5] - 25:4; 30:3; 32:7
**Nieto** [12] - 2:7; 12:13; 13:4; 24:6; 31:17; 33:12, 17; 43:21; 46:11; 51:7; 54:14, 21
**NIETO** [35] - 2:8, 16; 7:18; 8:11, 22; 13:5; 24:7; 25:14; 28:4, 7, 9; 29:11; 30:1, 17, 20, 23; 31:7, 11; 33:13, 18; 35:19; 41:10; 43:22; 45:21; 46:13; 49:18, 23; 50:1; 51:8; 52:22; 53:16; 54:8, 24; 55:2, 5
**Nieto's** [1] - 12:1
**night** [1] - 6:3
**nine** [1] - 14:13
**nonchalance** [1] - 6:4
**none** [2] - 4:22; 21:20
**nonetheless** [1] - 48:1
**nonexhaustive** [1] - 23:4
**normal** [1] - 40:3
**north** [1] - 24:23
**Northeast** [2] - 4:3; 24:24
**Northern** [1] - 4:1
**note** [2] - 18:18; 21:1
**notebook** [2] - 11:2
**nothing** [13] - 3:24; 4:13; 5:22; 10:6, 21; 15:3; 20:24; 25:3; 26:12; 44:20; 52:2; 55:10
**notice** [2] - 12:6; 35:12
**noticed** [1] - 50:16
**notion** [2] - 30:15; 31:9
**notwithstanding** [2] - 5:15; 6:6
**November** [2] - 3:18; 16:1
**number** [3] - 6:11; 13:14, 23
**numbers** [1] - 28:11
**object** [1] - 37:12
**objection** [2] - 16:15; 18:20
**observation** [1] - 35:4
**observe** [2] - 34:12; 37:11
**observed** [1] - 14:20
**obtain** [1] - 23:10
**obtained** [2] - 3:12
**obtaining** [1] - 3:6
**obvious** [1] - 52:16
**obviously** [9] - 7:6; 9:2; 10:12, 18; 34:2; 46:18, 21; 48:24; 49:10
**occasions** [1] - 32:2
**occupants** [1] - 41:17
**occur** [1] - 46:17
**occurred** [4] - 16:11; 25:20; 47:14; 51:24
**occurs** [2] - 22:11; 24:23
**October** [1] - 3:15
**OF** [1] - 55:14
**offenses** [10] - 24:10, 15; 25:10, 18, 20; 26:13, 17; 28:17; 31:22
**offer** [3] - 16:21; 33:4; 45:1
**offered** [4] - 17:12; 41:24; 50:11
**Officer** [3] - 10:11; 42:14
**officer** [35] - 26:1; 34:20, 23; 35:7, 20; 36:3, 14; 37:22; 38:19, 22; 39:3, 6, 8, 12; 41:14, 16, 18, 23; 42:9; 43:2, 4, 11; 44:2, 10; 45:16; 47:2, 15, 19, 21; 49:5; 51:14, 19, 21; 52:3; 53:9
**officer's** [6] - 35:5; 36:10; 47:8; 48:13, 16; 52:11
**officers** [7] - 35:17; 36:13; 37:1; 38:25; 40:1; 46:21
**officers'** [3] - 34:8, 10; 42:5
**OFFICIAL** [2] - 55:14, 21
**often** [1] - 4:16
**oftentimes** [2] - 35:25; 38:3
**Ohio** [3] - 4:3; 12:8
**once** [6] - 10:22; 11:19; 27:11; 34:25; 43:14; 53:4
**one** [29] - 4:2, 5; 5:14; 6:11, 21; 9:18; 13:23; 14:7, 22; 16:13; 20:12; 23:24; 24:16, 20, 22; 27:1; 29:5, 19, 24; 32:8; 33:15; 34:21, 23; 42:9; 45:7; 49:21; 52:4; 55:2
**one's** [1] - 35:13
**one-way** [1] - 4:2
**onerous** [1] - 21:6
**ones** [1] - 54:18
**ongoing** [1] - 5:7
**open** [5] - 47:18; 48:21; 51:24; 52:8; 53:5
**opened** [1] - 27:11
**opening** [4] - 5:3; 27:8; 40:9; 44:13
**opportunity** [5] - 17:5; 28:20; 35:3; 39:3; 55:7
**oppose** [1] - 8:8
**opposed** [1] - 8:8
**opposing** [1] - 18:14
**opposite** [1] - 25:1
**opposition** [3] - 23:24; 54:22
**oppressive** [3] - 20:9, 24; 21:15
**oral** [1] - 2:4
**orally** [1] - 22:20
**order** [5] - 2:5; 10:24; 11:10, 20; 53:17
**orders** [1] - 42:19
**ordinarily** [1] - 35:11
**outline** [1] - 53:2
**outlined** [2] - 2:17; 47:5
**outset** [1] - 16:4
**outweigh** [2] - 22:17, 22
**overlap** [2] - 26:18
**own** [3] - 4:15; 6:22; 39:10
**p.m** [4] - 2:2; 46:10; 55:13
**pace** [1] - 6:18
**packaging** [1] - 38:6
**Page** [1] - 18:5
**page** [1] - 55:18
**Pair** [7] - 13:11; 17:21; 19:13; 21:2, 12-13; 23:3
**pale** [1] - 6:4
**pandemic** [1] - 21:6
**paraphrase** [1] - 50:4
**Park** [1] - 24:24
**part** [8] - 5:8; 6:9; 10:22; 12:18; 13:22; 25:2, 6; 37:25
**participating** [1] - 16:25
**particular** [10] - 2:19; 24:17; 25:23; 26:16; 29:12; 30:24; 37:19; 39:17; 40:22
**particularly** [5] - 15:3; 20:24; 21:6, 15; 32:22
**parties** [2] - 6:17; 16:8
**parts** [1] - 24:13
**pass** [1] - 49:24
**passage** [1] - 19:18
**passed** [5] - 10:11; 11:19; 14:13; 17:6; 46:7
**passenger** [3] - 24:21; 32:19; 36:16
**passenger's** [1] - 45:8
**passing** [3] - 35:20, 23; 36:5
**past** [1] - 36:8
**pat** [1] - 40:11
**patterns** [1] - 26:18
**Patterson** [1] - 24:24
**payable** [1] - 40:7
**pendency** [2] - 4:7; 5:10
**pending** [4] - 2:23; 5:23; 16:19; 18:21
**percent** [1] - 8:3
**perform** [1] - 34:14
**perhaps** [3] - 36:24; 37:4, 7
**period** [14] - 5:18; 6:1, 14; 7:8; 8:13; 16:1, 12; 20:1, 18, 25; 21:11; 22:14, 18; 25:20
**periods** [2] - 19:11; 22:12
**permission** [1] - 40:10
**permissive** [1] - 31:22
**permits** [1] - 24:10
**Perry** [1] - 19:2
**person** [5] - 4:6; 24:22; 31:12; 39:9; 41:3
**perspective** [6] - 28:24; 30:21; 47:9; 48:13, 16; 54:17
**persuasive** [1] - 27:2
**pertaining** [4] - 27:9; 28:16; 46:14; 47:5
**petition** [1] - 24:9
**photo** [5] - 39:16; 41:15; 52:6, 23
**photos** [4] - 37:20; 45:25; 48:9, 21
**picture** [1] - 39:23
**pieces** [1] - 2:18
**pills** [2] - 48:8; 51:11
**pincite** [1] - 14:23
**pipes** [3] - 38:2
**place** [6] - 11:20; 15:20; 37:11; 40:14; 50:17; 53:18
**placement** [1] - 52:8
**plain** [9] - 33:24; 36:15, 19, 21; 37:10; 38:9; 44:12, 16; 47:6
**plan** [1] - 24:13
**plate** [6] - 35:10, 24; 36:7; 38:5; 41:20
**plea** [3] - 5:7; 11:19; 16:21
**pleases** [1] - 49:24
**plus** [1] - 5:22
**pocket** [17] - 46:25; 47:18, 20, 22; 48:15, 19; 50:16, 21, 24; 51:5, 24; 52:2, 8, 24; 53:1, 5, 7
**point** [13] - 3:22; 9:21; 11:16; 12:9, 14; 18:17; 28:23; 33:4; 44:1; 46:9; 51:18; 52:3, 18

**pointing** [1] - 52:19
**poisoned** [1] - 41:1
**poisonous** [6] - 40:25; 41:6; 47:3; 49:10, 17
**police** [17] - 26:18; 33:22; 34:4, 8, 12; 35:2; 38:25; 40:8, 19; 41:1; 44:9, 19; 47:15, 19; 48:16; 49:2, 11
**portion** [1] - 36:4
**Portion** [1] - 2:3
**portions** [1] - 28:11
**position** [12] - 11:8; 30:23; 35:8; 44:23; 46:5, 17; 47:1; 48:24; 49:4, 8; 53:8; 54:15
**positioning** [1] - 53:6
**possess** [2] - 37:24; 39:25
**possessed** [5] - 26:5, 7; 32:1, 12
**possessing** [2] - 40:11; 44:21
**possession** [16] - 2:22, 25; 3:1; 24:22; 28:1; 30:6, 8, 14, 16-18; 38:16; 48:25; 50:18
**possession's** [1] - 29:23
**possibility** [1] - 20:11
**possible** [2] - 36:6; 37:21
**post** [3] - 14:21, 24; 36:9
**post-accusation** [2] - 14:21, 24
**posted** [1] - 2:23
**precedent** [2] - 29:10; 32:23
**precisely** [1] - 47:9
**precision** [1] - 13:10
**precluded** [2] - 41:1; 49:11
**prejudice** [9] - 7:5; 9:18; 10:12, 17; 13:25; 20:5, 14; 21:9
**prejudicial** [4] - 9:21; 14:21, 25; 29:1
**preparation** [3] - 8:18; 17:14; 23:14
**preparations** [1] - 20:15
**prepare** [6] - 8:9, 12; 18:11; 24:1
**prepared** [2] - 11:1
**preparing** [1] - 11:4
**present** [5] - 8:19; 10:10; 18:15; 43:10; 51:10
**presented** [3] - 28:22; 29:18; 35:17
**presumably** [3] - 2:20; 3:3; 5:13
**presumptively** [2] - 14:21, 25
**pretrial** [27] - 2:12; 5:5, 25; 6:14; 11:22; 13:20; 15:5, 10, 14; 16:19; 17:5-7, 10; 18:11; 20:6, 9, 18, 25; 21:5, 11, 15; 28:14, 20; 53:20; 54:4, 14
**prevail** [1] - 14:1
**previous** [4] - 3:4; 4:6; 11:11; 54:14
**previously** [2] - 2:11; 55:6
**primarily** [2] - 5:11; 37:16
**prison** [1] - 21:7
**privacy** [1] - 36:21
**private** [2] - 3:23; 4:15
**probable** [13] - 34:19, 24; 36:2, 15; 37:21; 40:19; 41:22; 42:1, 25; 43:23; 46:18; 47:1
**probative** [4] - 29:22; 32:14, 19
**problem** [1] - 25:6
**Procedure** [1] - 24:10
**proceed** [2] - 22:10; 24:5
**proceeding** [3] - 9:9; 23:7
**proceedings** [2] - 55:13, 17
**process** [1] - 3:6
**professional** [1] - 27:5
**Professional** [1] - 55:15
**proffer** [3] - 7:15; 8:3; 10:16
**promptly** [1] - 17:2
**prong** [2] - 6:24; 7:5
**prongs** [1] - 24:15
**proof** [1] - 7:6
**properly** [1] - 25:18
**proposition** [4] - 19:10; 29:10, 22, 25
**propriety** [2] - 26:11; 34:6
**prosecution** [2] - 15:16; 29:2
**prosecutions** [1] - 13:7
**prosecutor** [1] - 26:15
**protection** [1] - 36:18
**protrude** [1] - 45:3
**prove** [3] - 18:4; 31:25; 34:13
**proved** [1] - 8:6
**provide** [12] - 8:3; 25:22; 33:5; 34:13; 45:25; 48:18; 49:6; 51:17; 52:1, 4, 10
**provided** [2] - 48:15, 21
**provides** [4] - 13:7; 22:13; 23:4; 53:7
**public** [4] - 13:8; 22:18, 22; 23:22
**pull** [5] - 34:9; 36:2; 38:23; 42:22; 43:23
**pulled** [1] - 37:5
**pulling** [3] - 36:13; 45:11; 53:4
**pulls** [4] - 42:14; 43:14; 44:10
**purpose** [2] - 34:5; 36:12
**purposefully** [1] - 17:16
**pursuant** [2] - 5:11; 55:16
**put** [6] - 2:18; 11:20; 12:6; 23:1; 53:22; 54:3
**putting** [1] - 7:9
**qualify** [1] - 14:25
**quantify** [1] - 13:13
**questioning** [1] - 31:20
**questions** [3] - 33:11; 40:10; 43:20
**quibble** [1] - 10:20
**quickly** [1] - 4:25
**quite** [6] - 9:23; 15:5; 32:24; 41:15
**quoting** [5] - 13:10, 12; 14:22; 17:21; 18:5
**radar** [1] - 3:4
**raise** [1] - 31:21
**raised** [3] - 31:20; 32:11; 33:2
**raises** [1] - 32:21
**Ramey** [1] - 19:23
**reach** [2] - 8:5; 16:14
**react** [1] - 50:17
**reacts** [1] - 42:17
**readily** [2] - 40:18; 48:12
**reading** [1] - 24:14
**ready** [4] - 2:7; 11:11, 21; 12:15
**reality** [2] - 27:15; 31:15
**realized** [2] - 4:13; 10:22
**realizes** [1] - 36:3
**really** [9] - 8:25; 9:14; 10:14; 12:23; 13:2; 39:2; 43:24; 44:20; 51:2
**Realtime** [1] - 55:15
**rear** [1] - 24:20
**reason** [10] - 6:5, 15; 10:23; 15:10, 18; 17:8; 21:22, 24; 50:11, 24
**reasonable** [10] - 6:15; 23:10, 13; 26:22, 24; 27:3; 34:10, 16; 46:22; 49:1
**reasonably** [1] - 23:11
**reasons** [10] - 11:9; 13:24; 15:13, 23; 17:12; 22:20; 24:2; 25:19; 33:6
**rebut** [2] - 32:14, 20
**receive** [1] - 11:3
**received** [1] - 11:2
**recess** [2] - 46:9
**recognize** [1] - 21:10
**recognized** [1] - 15:18
**recollection** [1] - 4:15
**record** [9] - 2:18; 9:11, 15, 17; 22:19; 23:1; 40:10; 53:23; 54:3
**recover** [1] - 41:3
**recovered** [5] - 45:2, 4, 13; 47:2; 48:10
**recovering** [1] - 34:1
**recovers** [3] - 42:20; 43:16
**recovery** [1] - 43:19
**reference** [1] - 45:22
**referenced** [1] - 45:1
**refile** [1] - 54:23
**reflected** [1] - 38:21
**reflecting** [1] - 39:7
**refused** [1] - 13:13
**regard** [4] - 27:12; 30:4; 39:17; 41:20
**regarding** [7] - 2:21, 25; 32:3; 33:1, 5; 41:13; 42:2
**regards** [4] - 24:8; 30:2; 45:24; 46:5
**Regional** [1] - 4:1
**Registered** [1] - 55:15
**regulations** [1] - 55:18
**rejected** [1] - 17:25
**related** [3] - 24:19; 34:10; 46:15
**relationship** [1] - 24:16
**relationships** [1] - 26:10
**relative** [1] - 5:8
**release** [1] - 6:2
**released** [1] - 2:23
**relevance** [1] - 39:9
**relevant** [3] - 29:1; 31:2
**relief** [1] - 6:10
**relieved** [2] - 11:7; 47:10
**remained** [1] - 3:18
**remaining** [1] - 46:12
**remains** [1] - 46:5
**remedy** [1] - 9:7
**remember** [1] - 49:20
**remiss** [1] - 5:19
**removed** [2] - 4:3; 39:4
**reported** [2] - 4:10; 55:17
**REPORTER** [2] - 55:14, 21
**Reporter** [2] - 55:15
**represent** [1] - 17:2
**representations** [1] - 9:10
**represented** [3] - 9:3; 10:7; 18:18
**representing** [2] - 4:18; 16:25
**request** [2] - 13:15; 17:3
**requested** [1] - 17:3
**requests** [2] - 5:14; 17:14
**require** [3] - 8:18;

22:9; 24:15
**required** [7] - 8:11; 13:2; 16:8; 17:3; 23:19, 25
**requirement** [1] - 14:9
**requires** [2] - 13:18; 15:9
**requiring** [1] - 13:22
**requisite** [2] - 5:13; 49:9
**research** [1] - 8:19
**resolution** [1] - 16:9
**resolve** [3] - 10:23; 11:18; 12:22
**resolved** [1] - 11:13
**respect** [4] - 19:4; 22:6; 52:20; 53:18
**respectfully** [4] - 30:20; 39:2; 44:5, 22
**respond** [1] - 39:3
**response** [7] - 18:8; 23:24; 33:3; 45:16, 19; 54:22
**responses** [1] - 55:8
**rest** [3] - 33:11; 43:20; 51:6
**result** [2] - 5:4; 23:8
**resulted** [4] - 15:25; 20:15; 33:24
**resulting** [3] - 3:9; 6:13; 22:14
**retained** [6] - 7:16; 16:20, 24; 17:1; 18:18
**retrieves** [1] - 51:6
**return** [2] - 26:2; 46:9
**review** [3] - 16:6; 37:25; 48:5
**reviewed** [1] - 48:5
**revisionist** [1] - 36:9
**revisit** [1] - 28:20
**rightfully** [1] - 41:19
**rights** [2] - 6:20; 27:22
**rise** [1] - 38:10
**rises** [1] - 12:17
**risk** [4] - 27:14; 31:15; 39:12
**Robinson** [1] - 19:18
**room** [1] - 6:17
**routine** [1] - 34:15
**RPR** [1] - 55:21
**Rule** [3] - 11:4; 24:9; 31:21
**rule** [2] - 17:25; 33:14
**rules** [2] - 20:21; 23:2
**ruling** [3] - 2:19; 53:12; 55:5
**rulings** [1] - 28:16
**run** [3] - 12:25; 27:14; 40:10
**running** [1] - 31:15
**Russell** [1] - 16:15
**safety** [1] - 39:3
**sake** [2] - 5:24
**salience** [1] - 35:11
**salient** [1] - 36:1
**saw** [14] - 37:22; 39:10, 22; 41:15, 18, 23; 42:9; 45:6; 50:10, 23; 51:4, 16; 52:19
**scales** [1] - 38:7
**schedule** [2] - 4:9; 55:9
**scheduled** [3] - 10:4; 16:17; 17:10
**scheduling** [4] - 5:1; 10:24; 11:20; 53:17
**scheme** [2] - 24:13; 25:3
**scope** [2] - 34:11, 16
**search** [18] - 33:25; 36:15, 22; 37:2; 39:5; 40:10; 41:6; 43:9, 18, 24; 44:18; 46:15, 17; 48:2; 49:13, 16; 51:2
**searches** [2] - 36:19; 43:14
**searching** [3] - 40:3, 9, 15
**seat** [3] - 33:24; 36:16; 45:8
**seated** [1] - 37:2
**second** [7] - 15:9, 18, 21; 17:17; 21:23; 47:18; 49:21
**secondary** [1] - 35:2
**seconds** [7] - 35:23; 49:20; 50:13, 20; 51:14; 52:13; 53:8
**see** [33] - 2:5; 5:18; 11:21; 12:17; 26:8; 35:8, 17; 37:19; 38:5, 25; 39:14; 40:13; 41:17; 43:10; 44:15; 46:25; 48:18, 20-21, 23; 49:7, 20; 50:7; 51:11; 52:4, 24; 53:1, 6; 54:4
**seeing** [1] - 50:23
**seek** [1] - 15:19
**seeking** [2] - 6:10; 15:8
**seem** [1] - 36:24
**seemingly** [3] - 6:21; 50:16; 51:4
**sees** [3] - 42:15; 44:6, 11
**seize** [2] - 34:4; 50:17
**seized** [1] - 40:17
**seizure** [6] - 26:2; 40:24; 46:17; 48:2; 49:9, 12
**selling** [1] - 25:25
**sense** [2] - 5:16; 45:10
**Separate** [1] - 2:3
**separate** [14] - 2:12; 14:2; 15:2; 24:10, 17; 25:2; 26:17; 27:17; 29:19; 31:1, 22; 32:1
**separated** [1] - 28:2
**separately** [1] - 33:16
**September** [30] - 2:21, 24; 3:6-9, 12-13; 6:13; 15:3; 24:18; 25:25; 26:23, 25; 27:7, 9; 28:25; 30:2, 5; 31:2, 13; 32:11, 17; 33:17, 21; 46:15, 25; 47:5
**series** [2] - 15:24; 24:19
**served** [2] - 22:17, 21
**serves** [1] - 14:8
**serving** [1] - 14:7
**set** [4] - 5:1; 17:8; 40:21; 55:9
**sets** [1] - 22:19
**sever** [1] - 24:9
**several** [4] - 15:19; 16:10; 17:10; 19:24
**severance** [2] - 24:6; 33:9
**severe** [1] - 13:17
**shall** [1] - 13:7
**share** [1] - 26:13
**sheet** [1] - 3:5
**shift** [1] - 12:4
**short** [2] - 14:24; 16:9
**shorter** [1] - 19:11
**shot** [1] - 48:14
**shots** [1] - 52:1
**shout** [1] - 42:11
**Show** [1] - 4:20
**show** [5] - 4:16; 13:2; 14:9; 37:11; 50:21
**showing** [3] - 10:10; 21:8, 14
**shows** [1] - 38:23
**shudder** [2] - 26:21; 27:14
**side** [2] - 24:25; 25:1
**similar** [5] - 24:11; 25:11, 18; 26:13; 31:23
**similarly** [1] - 32:16
**simple** [1] - 49:2
**simply** [4] - 6:2, 19; 38:18; 41:15
**single** [2] - 47:18; 48:19
**sitting** [3] - 3:19; 6:2; 44:14
**situation** [1] - 9:19
**six** [1] - 50:8
**Sixth** [7] - 2:14; 6:7; 12:18; 13:6, 8; 21:8; 22:6
**size** [1] - 51:12
**slightly** [1] - 47:18
**slow** [1] - 12:20
**slowly** [1] - 44:10
**smell** [1] - 38:8
**sole** [1] - 32:18
**soon** [2] - 6:25; 53:19
**sorry** [3] - 34:7; 45:21; 53:25
**sort** [18] - 4:10; 6:17; 7:11; 12:3, 10, 22; 26:4, 18; 30:9; 36:9; 38:3, 7; 39:11, 21; 42:12; 47:13; 52:25; 53:2
**sought** [2] - 3:7; 51:9
**sound** [1] - 10:5
**sounds** [2] - 2:13; 9:24
**southeast** [1] - 24:25
**space** [3] - 35:9, 25
**speaking** [2] - 3:11; 47:11
**special** [1] - 15:20
**specific** [1] - 29:14
**specifically** [6] - 26:1; 27:12; 36:14; 41:2; 46:3; 48:6
**specifics** [1] - 20:17
**specified** [1] - 13:14
**Speedy** [8] - 5:17; 6:6; 9:1; 16:2; 22:7, 9; 23:16; 24:3
**speedy** [45] - 2:14; 4:25; 5:11, 21; 6:8, 24; 7:3, 23, 25; 8:8, 14; 11:25; 12:11, 13; 13:8, 15, 17, 21, 25; 14:1, 10, 17, 19; 15:8, 21; 17:20, 22; 18:1, 4, 6, 10, 16, 22-23; 19:5, 12, 16, 25; 21:21; 22:4, 18, 23; 23:20, 22
**spending** [1] - 5:4
**spent** [3] - 3:21; 7:8; 12:14
**spillover** [1] - 32:21
**split** [1] - 50:13
**spoken** [1] - 50:19
**springs** [1] - 51:21
**stage** [1] - 33:8
**stages** [1] - 4:12
**stand** [3] - 27:6, 11; 44:13
**standard** [1] - 33:4
**start** [5] - 2:13; 19:22; 31:21; 40:3; 50:4
**started** [1] - 40:15
**starting** [2] - 2:12; 6:13
**state** [5] - 2:21, 25; 3:21; 4:11; 18:19
**statement** [3] - 15:20; 18:16; 44:9
**statements** [3] - 33:1; 44:5; 49:13
**States** [13] - 13:11; 15:17; 17:21; 19:2, 8, 17, 20, 23; 21:2; 22:25; 23:3; 55:16, 18
**states** [2] - 18:9; 19:4
**statutorily** [1] - 32:4
**statutory** [1] - 9:1
**stemming** [1] - 41:6
**stenographically** [1] - 55:17
**stenographically-reported** [1] - 55:17
**step** [1] - 48:19
**steps** [3] - 4:14; 7:1; 51:23
**still** [8] - 8:9; 16:21; 21:14; 28:23; 45:25; 48:1, 14; 52:1
**stomach** [1] - 53:1
**stop** [24] - 33:22; 34:3, 5-6, 11,

15, 17, 19; 35:4; 38:14; 40:3, 6, 24; 41:13, 22; 42:1, 5, 25; 43:9; 44:16; 46:21; 47:6; 49:2, 8
**stopped** [1] - 16:24
**stops** [1] - 46:22
**strategic** [2] - 9:8, 17
**stress** [1] - 20:16
**stretches** [1] - 14:19
**strong** [3] - 17:23; 32:24; 38:8
**stuff** [2] - 33:19; 42:3
**subject** [1] - 26:3
**subjected** [1] - 20:21
**submit** [20] - 4:5, 13; 5:7; 6:7, 25; 7:7, 12; 26:11; 27:25; 28:12; 29:5; 34:2; 36:10; 40:18; 41:5; 47:8; 49:10, 22; 52:17; 54:13
**submitted** [1] - 39:17
**subsequent** [1] - 34:10
**subsequently** [1] - 2:24
**substantial** [1] - 15:6
**suffered** [1] - 20:10
**sufficient** [8] - 14:16; 21:21; 29:17; 33:8; 34:13, 19; 35:3; 41:21
**suggest** [3] - 25:3; 38:18; 41:24
**suggested** [2] - 34:20; 35:5
**suggesting** [7] - 7:20, 22; 12:3; 35:19; 37:7; 47:21; 52:21
**suggestion** [1] - 36:3
**sum** [2] - 18:23; 20:24
**summer** [1] - 16:17
**superseding** [2] - 3:9, 14
**Supp** [1] - 19:9
**support** [12] - 6:10; 19:9; 29:10, 22, 25; 31:8; 32:2; 41:8; 43:8; 49:9; 52:22
**supported** [3] - 40:24; 44:8; 46:22
**supports** [4] - 7:12; 30:15; 35:17; 51:4
**suppose** [6] - 28:4, 24; 30:1, 20; 31:11; 36:24
**suppress** [1] - 46:14
**suppressed** [3] - 41:1; 47:3; 49:11
**suppression** [1] - 33:16
**Supreme** [8] - 13:11, 13, 21; 14:20; 15:17; 17:25; 20:6; 46:19
**surrounding** [2] - 29:15; 37:1
**suspected** [1] - 50:18
**suspicion** [4] - 34:16; 46:23; 49:1; 52:14
**switch** [1] - 31:4
**tag** [5] - 34:22, 25; 35:2; 36:4; 40:6
**tags** [1] - 35:1
**tall** [1] - 50:7
**tantamount** [1] - 8:18
**temporal** [1] - 26:10
**temporary** [3] - 34:3, 22; 35:1
**ten** [1] - 50:8
**term** [1] - 32:7
**terms** [6] - 7:15; 9:1; 10:18; 11:18; 41:5
**Terry** [1] - 46:21
**test** [2] - 13:22; 14:8
**testified** [7] - 37:22; 39:12; 41:16, 23; 50:23; 51:3
**testify** [6] - 27:10; 32:5; 33:2, 7; 45:15, 18
**testifying** [1] - 33:7
**Testimonial** [1] - 2:3
**testimony** [13] - 32:2; 33:6; 35:5; 36:11; 41:25; 47:12; 48:3; 49:7; 50:12, 25; 51:3; 52:11
**thankfully** [2] - 5:2; 47:14
**that'd** [1] - 49:25
**THE** [48] - 2:4, 15; 7:14; 8:7, 21, 23; 9:25; 10:3; 13:4, 6; 25:12; 28:1, 5, 8; 29:8, 20; 30:12, 19, 22; 31:4, 8, 17; 33:12, 14; 35:15; 41:9, 11; 43:21; 44:24; 45:15, 20; 46:7, 11; 49:15, 19, 25; 50:2; 51:7; 52:18; 53:10, 17; 54:1, 6, 11, 18, 20; 55:4, 7
**themselves** [4] - 9:5; 16:11; 26:14; 40:12
**then-pending** [1] - 18:21
**theory** [2] - 32:11; 41:13
**therefore** [5] - 13:1, 24; 15:6; 17:17; 35:1
**thereof** [1] - 34:22
**third** [9] - 6:24; 17:19; 19:4; 20:2, 11-12; 21:25; 25:15
**three** [8] - 4:2; 6:14; 12:24; 13:24; 20:7; 25:17, 19
**three-hour** [1] - 4:2
**three-week** [1] - 25:20
**three-year** [1] - 6:14
**threshold** [1] - 14:8
**throughout** [1] - 4:7
**timekeeping** [1] - 46:2
**timeline** [1] - 47:13
**timeliness** [3] - 11:24; 13:24; 17:20
**timely** [1] - 19:5
**timing** [1] - 10:18
**tint** [8] - 33:23; 34:23; 35:18; 40:6; 41:20; 42:2
**tinted** [3] - 35:3; 42:3; 43:2
**today** [5] - 10:7; 17:9; 53:14, 22; 55:11
**today's** [1] - 8:5
**together** [3] - 7:9; 27:3, 17
**toll** [4] - 5:21; 7:23; 8:14; 22:15
**tolled** [2] - 5:11, 19
**tolling** [3] - 7:3; 8:14; 23:20
**took** [4] - 7:1; 11:22; 50:19; 52:21
**topics** [1] - 16:10
**total** [1] - 3:19
**totality** [1] - 29:2
**towards** [3] - 48:7; 50:14; 53:1
**traditional** [1] - 34:15
**traffic** [19] - 33:22; 34:6, 12, 15, 19, 24; 35:4, 22; 37:5; 40:3, 6; 41:13, 22; 42:1, 5, 25; 43:9; 44:16; 47:6
**trained** [2] - 27:4; 35:22
**training** [3] - 43:5; 53:23
**transaction** [1] - 24:12
**Transcript** [1] - 2:3
**transcript** [2] - 55:17
**transferred** [1] - 20:19
**transfers** [1] - 20:20
**transgressions** [1] - 4:24
**traveled** [1] - 32:6
**tree** [4] - 40:25; 41:6; 47:4; 49:18
**Trial** [8] - 5:17; 6:6; 9:1; 16:2; 22:7, 9; 23:16; 24:3
**trial** [76] - 2:14, 24; 4:25; 5:1, 6, 11, 21; 6:5, 8, 11, 24; 7:3, 23, 25; 8:1, 8, 10, 14; 9:6; 10:3; 11:5, 7, 11, 21, 25; 12:11, 13, 15; 13:8, 15, 17, 19, 21, 25; 14:1, 5-6, 10, 15, 17, 20; 15:8, 21; 16:9, 17, 23; 17:10, 20, 22; 18:1, 5, 7, 10, 12, 17, 22-23; 19:5, 12, 16, 22, 25; 20:15; 21:21; 22:4, 10, 18, 23; 23:20, 23; 24:1; 26:21; 28:2; 29:4; 49:12
**trials** [2] - 28:3; 31:1
**tried** [4] - 8:13, 15-16; 27:17
**trigger** [2] - 14:16, 19
**triggers** [2] - 14:10, 12
**troubling** [1] - 27:5
**true** [3] - 25:22; 45:7; 55:17
**truly** [1] - 5:17
**truth** [1] - 13:18
**trying** [6] - 8:5; 12:4, 22; 35:16; 38:1; 50:4
**turned** [1] - 51:22
**turning** [2] - 15:9; 51:25
**turns** [1] - 48:18
**two** [31] - 5:22; 13:23; 14:13; 15:1; 16:7; 18:13, 24-25; 20:10; 24:15, 17, 20; 25:4, 19; 26:16; 27:16, 18; 28:3; 29:15, 19, 23; 31:1; 33:15; 34:7, 21; 35:6; 45:7; 46:8; 51:13
**two-plus** [1] - 5:22
**two-year** [1] - 18:25
**type** [4] - 4:19; 10:17; 35:11; 47:9
**typical** [1] - 21:1
**U.S** [9] - 6:12; 13:12; 14:23; 25:7; 43:19; 47:23; 48:25; 52:9, 25
**U.S.C** [1] - 55:16
**umbrella** [2] - 6:7; 30:10
**unable** [1] - 16:14
**unacceptable** [1] - 6:19
**unadulterated** [1] - 51:18
**unbiased** [1] - 51:18
**unclear** [1] - 47:24
**uncommonly** [3] - 6:11; 14:6, 16
**under** [14] - 6:7; 7:12; 16:22; 23:20; 27:19; 28:4; 29:6; 30:9; 36:16; 43:7, 18; 45:8; 50:17; 53:11
**undermined** [1] - 41:25
**underneath** [1] - 33:24
**unhappy** [2] - 12:5, 12
**unique** [1] - 40:21
**United** [13] - 13:11; 15:17; 17:21; 19:2, 8, 17, 20, 23; 21:1; 22:25; 23:2; 55:15, 18
**unless** [1] - 43:20
**unpublished** [1] - 19:3
**unreasonable** [1] - 36:18

**unrelated** [1] - 2:25
**untimeliness** [1] - 22:1
**untimely** [1] - 20:2
**unusual** [2] - 36:24
**up** [18] - 4:16; 5:3; 12:22; 27:8, 11; 34:21; 36:8; 37:17; 42:3; 44:11; 47:23, 25; 50:13; 52:25; 53:13, 19
**vague** [1] - 33:3
**valid** [3] - 15:14, 24; 17:15
**value** [2] - 29:22
**vantage** [2] - 51:18; 52:3
**various** [1] - 19:17
**vd** [1] - 25:15
**vehicle** [34] - 24:21; 26:5; 30:3, 8; 32:17; 34:1, 14, 20, 22; 35:7, 12, 20, 24-25; 36:5; 37:24; 40:5, 15; 41:7, 15, 19; 42:19, 23; 43:1, 4, 7, 9, 14, 23, 25; 44:21; 45:11
**verdict** [1] - 27:23
**versa** [1] - 29:2
**versus** [2] - 19:2; 39:22
**viability** [1] - 7:25
**vice** [1] - 29:2
**video** [10] - 10:10; 38:22; 44:6; 47:14, 19; 48:5; 49:7; 51:20; 52:10
**videos** [1] - 52:16
**view** [10] - 33:24; 36:15, 19, 21; 37:10; 38:9; 41:14; 44:12, 17; 47:6
**viewing** [3] - 36:20; 51:15, 23
**vigor** [2] - 13:24; 17:20
**violated** [2] - 19:1; 24:3
**violating** [1] - 13:16
**violation** [14] - 5:17; 12:18; 19:13; 21:8, 21; 22:4, 7; 23:16; 34:12, 24; 40:6; 42:2; 43:13
**violations** [1] - 35:22
**Virginia** [2] - 4:2; 12:7
**visible** [2] - 47:15
**visits** [2] - 4:7, 9
**visual** [1] - 35:10
**voluminous** [2] - 8:17; 15:5
**wad** [3] - 47:23; 48:23; 52:5
**waistband** [1] - 39:7
**waited** [2] - 19:21, 24
**waiting** [2] - 20:1; 37:3
**waits** [1] - 19:6
**waives** [1] - 18:1
**walking** [2] - 50:14
**wants** [3] - 42:22; 54:14, 21
**warn** [1] - 45:10
**warrant** [2] - 41:7; 46:18
**warrantless** [1] - 33:25
**warrantly** [1] - 40:15
**Warsaw** [1] - 4:2
**watched** [1] - 48:7
**ways** [2] - 27:4; 31:14
**weapon** [2] - 26:6; 39:17
**week** [2] - 3:18; 25:20
**weigh** [9] - 14:3, 18; 18:25; 19:13; 21:17; 22:4; 43:24
**weighed** [3] - 19:6; 20:2; 21:3
**weighs** [6] - 15:7; 17:17; 20:4; 21:23
**weight** [1] - 17:23
**weights** [1] - 15:13
**whichever** [1] - 22:11
**white** [3] - 48:8; 50:23; 51:12
**whole** [1] - 37:15
**wholly** [1] - 37:21
**Williams** [39] - 2:11, 20; 3:3, 17, 23, 25; 4:7, 10, 23; 5:4, 20; 6:1, 10; 7:1; 9:8, 16; 10:7; 12:2; 25:6, 25; 27:6; 32:12, 16; 33:21; 37:2; 39:2; 40:5, 24; 43:15, 17; 44:9; 47:3; 48:2, 18; 49:9, 13; 51:22; 53:9
**Williams'** [4] - 4:17; 5:9; 11:25; 47:17
**Williams's** [6] - 4:6; 6:20; 21:10, 15; 28:17; 41:3
**willingness** [1] - 26:2
**window** [4] - 41:20; 42:3, 9; 43:1
**windows** [1] - 35:3
**windshield** [5] - 33:23; 35:18; 41:16, 23; 42:2
**Wingo** [4] - 6:9; 7:12; 13:12, 22
**wish** [1] - 27:10
**wishes** [2] - 2:13; 48:5
**witness** [2] - 10:8
**witnessed** [1] - 35:7
**witnesses** [5] - 7:10; 11:1; 12:16; 26:19; 47:12
**word** [2] - 20:13; 39:14
**words** [1] - 30:13
**works** [1] - 54:8
**worn** [8] - 2:22; 46:24; 47:10, 17; 49:4; 50:6; 51:10, 17
**worthwhile** [1] - 42:10
**writing** [1] - 22:20
**written** [2] - 34:21; 53:12
**yank** [1] - 42:11
**yard** [1] - 51:25
**year** [13] - 6:14; 10:19; 14:22; 16:18; 17:11; 18:7, 13, 25; 19:19; 22:25; 28:15
**years** [5] - 5:22; 6:21; 8:18; 14:13; 18:24
**yell** [1] - 38:24
**Youngstown** [1] - 4:4
**zero** [1] - 8:3
**§** [4] - 22:13; 23:4, 20; 55:16